**LINCOLN SERVICES, LTD.**

v.

**The UNITED STATES.**

No. 319–77.

United States Court of Claims.

April 21, 1982.

**158**

Branko Stupar, Washington, D. C., attorney of record, for plaintiffs. Donegan Mann, Washington, D. C., of counsel.

Heidi Herrington Debevoise, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant.

Before NICHOLS, KASHIWA and NIES,* Judges.

## OPINION

### PER CURIAM:

This case comes before the court on the parties' exceptions to the recommended decision of Trial Judge Kenneth R. Harkins, filed January 30, 1981, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision with slight modifications, as hereinafter set forth,** it hereby adopts the

---

* Judge, United States Court of Customs and Patent Appeals, sitting by designation.

** Although the court adopts the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein.

1. *Keco Indus. v. United States*, 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203–04 (1974) (Keco II).

2. NAVFACINST 11101.85A, Feb. 19, 1971, with amendments to the date of procurement. On

decision as the basis for its judgment in this case. Therefore it is concluded that plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

■ HARKINS, *Trial Judge*: Plaintiff was unsuccessful in an effort to obtain a contract from the Naval Facilities Engineering Command, Atlantic Division (NAVFAC–ATL), for the construction of 250 military family housing units at the United States Naval Station, Bermuda and now seeks to recover $150,000 assertedly expended in its proposal effort. Proposal preparation expenses are a cost of doing business that normally are "lost" when the effort to obtain the contract does not bear fruit. In an appropriate case, however, a losing competitor may recover the costs of preparing its unsuccessful proposal if it can establish that the Government's consideration of the proposals submitted was arbitrary or capricious. The standards that permit a disappointed competitor to recover proposal preparation expenses are high and the burden of proof is heavy.[1]

Plaintiff has failed to satisfy the standards that would permit recovery and its claim must be dismissed.

NAVFAC–ATL issued its request for proposals (RFP) for the Bermuda housing project on March 5, 1974. The RFP solicited proposals for a turnkey design and construction contract, in a project programmed to cost $8,650,000 for the 250 units, with a maximum price of $41,490 for the most expensive unit, and an average unit price not to exceed $34,600. Proposals were to be submitted by May 16, 1974. The RFP specified that a NAVFAC instruction[2] "Turnkey

Oct. 10, 1974, the Turnkey Manual was revised, NAVFACINST 11101.85B. The Turnkey Manual consists of a transmittal letter with three enclosures: (1) Turnkey Procurement Procedures, (2) Standard Request for Proposals for Turnkey Naval Housing Projects, and (3) Standard Technical Evaluation Manual for Turnkey Navy Family Housing Projects (For Official Use

Procedures for Navy Housing Projects," (Turnkey Manual) would apply to the procurement and to NAVFAC–ATL's evaluation of the proposals.

Plaintiff and two other companies, Kemmons-Wilson Construction Company and J. R. Stevenson Corporation, submitted proposals, which in accordance with the Turnkey Manual, were assigned identifying code numbers to preserve anonymity. Kemmons-Wilson was assigned B–412, plaintiff's three proposals were B–413–A, B–413–B, and B–413–C, and J. R. Stevenson's was B–420.

J. R. Stevenson's proposal was found to be nonresponsive and that company thereafter withdrew from further participation. On May 30, 1974, the Selection Board considered proposals B–412 and B–413–A, –B, and –C and found each exceeded the $8,650,000 total project cost. One reason for the high costs was that both companies had included construction materials that exceeded the minimum criteria in the specifications. All proposals were rejected by NAVFAC–ATL.

NAVFAC–ATL, in June 1974, returned the proposals to Kemmons-Wilson and to plaintiff, with the drawings marked up to indicate areas that needed clarification or revision. Specific features that were unacceptable to NAVFAC–ATL were identified. Plaintiff was notified that proposal B–413–B was no longer being considered and that additive features that plaintiff had submitted in its proposals were excluded from further consideration. Both compa-

nies were requested to review and resubmit their proposals by June 21, 1974, with cost reductions that conformed with the Federal Housing Administration (FHA) specifications that applied to the project.

When the modified proposals were resubmitted on June 21, NAVFAC–ATL learned that inadequate funding limits had forced both companies to downgrade the project below minimum acceptable standards. At the same time, the total project cost continued to be excessive. NAVFAC–ATL concluded that adequate housing could not be constructed with funds available, and on July 15, 1974, notified both companies the resubmitted proposals were rejected.

In addition to its rejection of the June 21, 1974, proposals, NAVFAC–ATL in its July 15, 1974, letter advised the competing companies that legislation had been requested for fiscal year 1975 that would authorize an average per unit expenditure for non-United States military housing of $40,000. If authorized, this would raise to $10 million the permissible expenditure for the Bermuda project. NAVFAC–ATL decided, in order to avoid readvertisement of the Bermuda project and to take advantage of the proposal effort already expended by the companies, to hold the project in abeyance and to make the award when additional funds were authorized, so that the project could provide the higher cost housing that originally had been proposed.

NAVFAC–ATL amended the RFP specification to provide reductions in scope that were acceptable.[3] The companies were re-

Only). A turnkey project is one in which the developer builds in accordance with plans and specifications of his own architect subject to performance specifications for quality and workmanship, and with limited guidance for features as style of house, number of bathrooms, etc. 1 B J. McBride & 1. Wachtel, GOVERNMENT CONTRACTS § 9.120[12] (1980). Although NAVFAC forms permit award without further discussion, the Comptroller General has stated that a turnkey contract should not be awarded on initial proposals, and that oral or written discussion should be conducted. 55 Comp.Gen. 59 (1976).

3. The deductive items were:

"DEDUCTIVE ITEM NO. 1 — OMIT ALL NEW TREES AND SHRUBS.

"DEDUCTIVE ITEM NO. 2 — OMIT ALL WALKWAYS PARALLEL TO STREETS.

"DEDUCTIVE ITEM NO. 3 — DEDUCT FOR PROVISION OF OVERHEAD ELECTRICAL DISTRIBUTION IN LIEU OF UNDERGROUND.

"DEDUCTIVE ITEM NO. 4 — OMIT ALL TOT LOT AND PLAY AREA EQUIPMENT.

"DEDUCTIVE ITEM NO. 5 — DEDUCT FOR PROVISION OF WALL HUNG LAVATORIES IN LIEU OF VANITIES.

"DEDUCTIVE ITEM NO. 6 — OMIT ALL PATIOS AND BALCONIES.

"DEDUCTIVE ITEM NO. 7 — DEDUCT FOR CONSTRUCTION OF 250 2-BEDROOM APARTMENT FLATS."

quested to review the amended specifications and to adjust the content of their original May 16, 1974, proposals. Changes in the original proposals resulting from the amended specifications were to be itemized and the proposals resubmitted by August 15, 1974. At plaintiff's request, the deadline was advanced to August 6, 1974.

Kemmons-Wilson submitted its response (B–412) by letter dated July 31, 1974. This proposal was to construct a 250–unit project at a total cost of $10,243,558; certain deductible features were identified, which, if accepted, would reduce the total price to $9,457,980, with an average unit price of $37,831.92. These prices were reconfirmed by Kemmons-Wilson after NAVFAC–ATL pointed out areas of the B–412 proposal that needed clarification for compliance with specifications.

Plaintiff's response, received on August 6, 1974, resubmitted three alternate project schemes: B–413–A, –B, and –C.[4] Each of the revised proposals provided that the total price would increase $500,000 if not accepted by NAVFAC–ATL by August 24, 1974. Plaintiff's prices in its alternate proposals were:

| | Base Price (8/6/74) | Adjusted for Deductions (8/6/74) | Adjusted Price with escalation (After 8/26/74) |
|---|---|---|---|
| B–413–A | $ 9,270,000 | $8,548,900 | $9,048,900 |
| B–413–B | 10,153,000 | 9,371,900 | 9,871,900 |
| B–413–C | 9,800,000 | 9,250,000 | 9,750,000 |

NAVFAC–ATL on August 15, 1974, notified plaintiff that alternate B–413–B complied with the minimum technical requirements of the amended RFP specifications and that alternates B–413–A and B–413–C required scope and contract clarification in seven specifically identified features, one of which was that a 60-day extension of the bid bond was required. Plaintiff accepted all clarifications requested by NAVFAC–ATL at no change in prices proposed.

The Turnkey Manual provides for a two-stage consideration of proposals that are determined by NAVFAC's contracts division to be administratively responsive to the RFP. Each NAVFAC engineering field division is required to establish a permanent Technical Evaluation Team and a Selection Board to evaluate turnkey proposals. The Technical Evaluation Team reviews technical portions of the proposals and assigns quality points; its members are not to be aware of the identity of a proposer or the price offered. The Selection Board receives a report from the Technical Evaluation Team, computes a cost/quality ratio, and recommends a proposer for award; its members are not to be aware of the identity of the proposers until a selection has been made. The representative of the contracts division designated in the RFP as NAVFAC's contact with the proposers, who has custody of the contractor identification codes, may not be a member of the Selection Board.

On August 6, 1974, the alternate proposals that had been submitted by Kemmons-Wilson and by plaintiff were referred to the Technical Evaluation Team, which made an oral report to the Selection Board on August 12, 1974. No member of the Technical Evaluation Team knew the identity of the companies when it made its technical evaluation and oral report. Two members of the Selection Board, however, knew the identity of the proposers and their pricing information when the Selection Board acted on the report of the Technical Evaluation Team: the senior member of the Selection Board and the contract specialist.

At the August 12, 1974, meeting, the Selection Board was advised that the maximum funds available for the Bermuda project, provided waivers for requirements for in-house design and proposer design could be obtained from Washington headquarters, was $9,125,000 for FY 1974 and $9,743,000 for FY 1975. Members of the Technical Evaluation Team reported orally on their respective fields of responsibility, and the Selection Board accepted without change the point assessments recommended.

---

4. Alternate B–413–A included 26 items of scope and quality reductions from the original submission; alternate B–413–B modified original B–413–A or B–413–C only to the extent permitted by the revised RFP specifications; and alternate B–413–C essentially was the original B–413–A and B–413–C with 26 itemized scope and quality reductions.

The Technical Evaluation Team had assigned points in each case on the basis of the originally specified project, without including any of the deductible items.[5] The lowest point rating was given plaintiff's proposal B–413–A, and the highest rating was given to plaintiff's proposal B–413–B.

The Selection Board, however, applied the assessed points to the price proposed after all deductible work was removed from the base bid price. The dollar/point ratio thus derived for Kemmons-Wilson during all time periods, was $19,912. Plaintiff's dollar/point ratio for the period before August 26, 1974, was $19,165 for B–413–B and $19,254 for B–413–A. Both were lower than the Kemmons-Wilson ratio. Plaintiff's B–413–B proposal, before August 26, 1974, however, although it gave the most construction per dollar, exceeded the FY 1974 funding maximum. Plaintiff's B–413–A was within the funding maximum both before and after August 26, 1974, but it had the lowest quality points and its ratio was above that of B–413–B before August 26, 1974. For this reason, it was not acceptable to NAVFAC–ATL as the most construction per dollar invested, notwithstanding that in the period before August 26, 1974, its dollar/point ratio was less than that of Kemmons-Wilson.

Except for plaintiff's B–413–A, all of the pre-August 26, 1974, proposals exceeded the FY 1974 available funds and the $34,600 average price per unit ceiling. After August 26, 1974, plaintiff's $500,000 price increase on each proposal raised the dollar/point ratio of B–413–A, to an unacceptable high of $20,380 and the B–413–B ratio to $20,188. The B–413–B proposal, after August 26, 1974, exceeded maximum funds available for FY 1975. The Kemmons-Wilson proposal B–412 was within the FY 1975 funding and its dollar/point ratio of $19,912, the lowest in competition, after August 26, 1974, provided the most construction per dollar.

The Selection Board at the August 12, 1974, meeting also compared the dollar/point ratios with only one of the seven deductible items taken (No. 7—Deduct for Construction of 250 2-Bedroom Apartment Flats). This comparison showed plaintiff's B–413–B with a dollar/point ratio of $20,640; Kemmons-Wilson's B–412 had a lower ratio of $20,421. In these circumstances, the Selection Board concluded that award of a contract for the Bermuda project was contingent upon enactment of the FY 1975 legislation.

On September 6, 1974, NAVFAC–ATL issued an invitation for bids (IFB) for construction work on water meter pits for the Bermuda housing project. The specification in the IFB used site location drawings that coordinated with the Kemmons-Wilson B–412 proposal. Plaintiff submitted a bid on September 16, 1974, and it was accepted by NAVFAC–ATL on September 26, 1974.

On September 25, 1974, the Selection Board recommended that Kemmons-Wilson's proposal B–412 receive the contract award, on the basis of the base bid and deductive item No. 7, contingent on enactment of the FY 1975 construction authorization. The recommendation was accepted on December 19, 1974. The FY 1975 construction authorization was enacted on December 27, 1974, and NAVFAC–ATL executed a letter contract with Kemmons-Wilson on January 6, 1975, at a total price of $9,580,950 for the entire work less deductive items 1, 2, 4, and 7. The formal contract was executed as of January 6, 1975.

On December 12, 1974, plaintiff filed a bid protest with the General Accounting Office (GAO) that alleged NAVFAC–ATL's award was based on funding in excess of that available for the RFP, and was unlawful. Plaintiff asserted the award should have been made on its proposal B–413–A, because it was within the FY 1974 funding limits. Prior to resolution of this protest, the contracting officer on January 3, 1975,

---

**5.** Points assigned, ranked from lowest to highest, were as follows:

| | | | |
|---|---|---|---|
| B–413–A | 444 | B–412 | 475 |
| B–413–C | 462 | B–413–B | 489. |

authorized award of the Bermuda housing project contract.[6]

On January 9, 1975, plaintiff requested NAVFAC–ATL, under the Freedom of Information Act (FOIA), to furnish all records related to the Bermuda project contract. During January 1975, with knowledge that the GAO protest and the FOIA request were pending, the head of the Technical Evaluation Team destroyed the handwritten notes that had been prepared by the team and used in the oral presentations to the Selection Board. The Technical Evaluation Team notes were destroyed with the approval of the senior member of the Selection Board and of NAVFAC counsel.

On February 24, 1975, plaintiff, in the United States District Court for the District of Columbia, sought a temporary restraining order (TRO) to prevent further action on the contract. A TRO was denied on February 26, 1975,[7] and the case was transferred to the District Court for the Eastern District of Virginia (Norfolk Division).[8] Trial on the merits was held on June 5, 1975, and, on October 24, 1975, the District Court ruled plaintiff's request for a preliminary injunction was without merit. Plaintiff appealed the adverse ruling to the United States Court of Appeals for the Fourth Circuit,[9] which, on November 19, 1976, vacated the judgment of the District Court

and remanded with instructions to dismiss the petition because injunctive relief was not feasible. Kemmons-Wilson at that time substantially had completed the contract. The petition was dismissed on January 3, 1977.[10]

Plaintiff's challenge to NAVFAC–ATL's award to Kemmons-Wilson is a generalized attack that invokes most of the judicially recognized grounds for a disappointed bidder to recover proposal preparation expenses. NAVFAC–ATL's award of the Bermuda housing project contract assertedly is "arbitrary and capricious" because relevant records were destroyed and for noncompliance with Turnkey Manual procedures. Selection Board members are accused of "subjective bad faith" and a "calculated disregard for fairness and integrity" in dealing with competing proposals. Also, the board allegedly predetermined its decision to award the housing project to Kemmons-Wilson, which deprived plaintiff of an opportunity to have its proposal considered "fairly and honestly."

Proof of plaintiff's claim, however, rests upon NAVFAC–ATL's failure to comply with numerous provisions in the Turnkey Manual. This failure is augmented by NAVFAC–ATL's asserted failure to comply with the requirements in Armed Services Procurement Regulation (ASPR) § 1.308 [11]

---

**6.** The Comptroller General on May 6, 1975, declined to rule on the merits of plaintiff's protest on the ground a civil action was then pending in the United States District Court for the Eastern District of Virginia (Norfolk Division).

**7.** *Lincoln Services, Ltd. v. Secretary*, No. 75–0249 (D.D.C. Feb. 26, 1975).

**8.** No. 75–90–N.

**9.** App.No. 76–1041.

**10.** In this court, by stipulation of the parties, the case was submitted on the record of the proceedings in the United States District Court for the Eastern District of Virginia. Post-trial briefing was completed from that record on May 9, 1980.

**11.** ASPR § 1.308 provides:
"(a) Each office performing purchasing, contract administration, or contract paying functions shall maintain official records of all ac-

tions with respect to solicitations and contracts in accordance with the provisions of this section, . . .
"(b) . . . [These files] . . . shall contain documentation of all actions taken with respect to the contract, including final disposition, sufficient to constitute a full history of the transaction and permit ready reconstruction of all stages of the transaction, for the purpose of (1) providing a complete background to assure informed decisions at each step in the procurement, (2) supporting actions taken by personnel in the procurement cycle, (3) providing information for reviews and investigations conducted by the Department concerned, the Department of Defense, the General Accounting Office, or others, and (4) furnishing essential facts in the event of litigation or Congressional inquiries."
On Mar. 8, 1978, Department of Defense directive No. 5000.35 was issued redesignating the ASPR as the Defense Acquisition Regulations (DAR). The regulation numbering system was continued.

and for contract documentation sufficient to provide a full history of the transaction that would permit reconstruction in all its stages.

█ Proven violation of pertinent statutes or regulations can be, but need not necessarily be, a basis for recovery of proposal preparation expenses. Not every violation of a procurement regulation, however, makes a valid claim. Not every regulation is established for the benefit of bidders as a class, and still fewer created rights to an awardee's competitors that may be asserted against the United States.[12] Failure to comply strictly with the provisions of the Turnkey Manual does not have the effects plaintiff claims because the manual was not designed to confer rights to losing contractors, or to so circumscribe the discretion of NAVFAC contracting officials that they could not devise flexible procedures.

The Turnkey Manual was published to provide standardized guidance to NAVFAC's field divisions in contracts with the housing construction industry. Its purpose was to make available comprehensive in-house procurement procedures for the preparation of RFPs for turnkey projects, and for the evaluation of proposals submitted in response. Prior to its publication, comments were not solicited and its terms were not published in the Federal Register as official regulations of the United States. Enclosure (3) of the Turnkey Manual, relative to the technical evaluation of proposals, was "For Official Use Only." It was not intended to make publicly available information on relative weights given to the four major evaluation areas and to the allocation of specific point values in those areas. The manual provides a mechanism for negotiation and adjustment; its procedures are not analogous to awards made after formally advertised invitations for bids. RFPs prepared in accordance with the Turnkey Manual reserved the right to re-

ject any and all proposals any time prior to award, to negotiate with any proposer, to award a contract to other than the company that offered the lowest price proposal, and to award the contract on the proposal "determined by the Navy to be the most advantageous to the Government."

Flexibility in administration, negotiation and contract award in a turnkey project is authorized in many provisions of the manual. NAVFAC's policy is to utilize the Turnkey Manual "to the maximum extent possible." Although provisions for the establishment of a permanent Technical Evaluation Team and a Selection Board suggest certain categories of personnel for membership, "[t]he suggestion should not be construed as mandatory." A NAVFAC division should "appoint its best qualified personnel to the Team and Board, regardless of where they are normally employed in the organization." Enclosure (3) of the manual, in its statement of purpose, provides a procedure for amendment and modification to meet the specific requirements of a particular project because "it is recognized that no single criterion can be developed to cover all project developments."

Plaintiff asserts that paragraph 5 in the Turnkey Manual transmittal letter severely limited the division's authority to deviate from the manual's "administrative, technical or contractual procedures/standards." As a result, the effect of the manual is claimed to "limit in a very restrictive sense the generally accepted discretionary power of the contracting officer."

█ The standard of proof required for recovery of bid preparation expenses is related to the amount of discretion entrusted to the procurement officer by applicable statutes and regulations, and, where arbitrary and capricious action is charged, the standard is high.[13] Plaintiff fails to recognize the flexibility embodied in the administrative procedures available in contracts for

---

**12.** *Keco II, supra* note 1, 203 Ct.Cl. at 578, 492 F.2d at 1206.

**13.** *Keco II, supra* note 1, 203 Ct.Cl. at 572–78, 492 F.2d at 1203–06; *Continental Business En-*

*terprises v. United States,* 196 Ct.Cl. 627, 637, 452 F.2d 1016, 1021 (1971); *Keco Indus. v. United States,* 192 Ct.Cl. 773, 784, 428 F.2d 1233, 1240 (1970) (Keco I).

a turnkey project. The high standard of proof required to establish arbitrary and capricious conduct, applies to the negotiated procurement that is authorized for award of a NAVFAC turnkey housing contract.[14] Contract award in a turnkey housing project inherently is a judgmental process that does not accommodate itself to absolutes.[15]

Plaintiff asserts the *Accardi* doctrine[16] requires strict enforcement of the Turnkey Manual notwithstanding the discretionary nature of NAVFAC–ATL's actions. The Turnkey Manual is seen as such a regulation that violations of its provisions establishes that NAVFAC–ATL's action was arbitrary and capricious. The Turnkey Manual, however, is not an *Accardi* doctrine type of regulation, nor are the administrative procedures involved comparable. *Accardi* involved a formal deportation proceeding under Section 14 of the Immigration Act of 1924. This statute was supplemented by regulations duly published in the Federal Register that had the force and effect of law. The regulations were found by the Supreme Court to have delegated to the Board of Immigration Appeals discretionary authority as broad as that the statute conferred on the Attorney General.[17]

Plaintiff also points to application of the *Accardi* doctrine to a Department of Defense (DoD) directive in the *Brooks* case.[18] There the DoD directive established procedures, and were for a purpose, that differed materially from the procedures and purpose of the Turnkey Manual. *Brooks* was a habeas corpus proceeding to determine the rights under the Military Selective Service Act of 1967, as amended, of a person who by reason of religious training or belief was conscientiously objecting to participation in war in any form. DoD directive No. 1300.6 was a regulation that encompassed proce-

dures set forth in Army Regulation No. 635–20, dated December 3, 1968. Both were duly published and had the force and effect of law.

■ NAVFAC–ATL's failure to comply with Turnkey Manual provisions cited by plaintiff does not amount to arbitrary and capricious action or a failure to fairly and honestly consider plaintiff's proposals. NAVFAC–ATL clearly violated the criteria established in the manual relative to point awards in a technical evaluation. The evaluation range for items that had no minimum standard started at zero; and, if an item of work did not comply with the minimum criteria, it was to be marked "nonconforming" and "no points will be assigned." NAVFAC–ATL's Technical Evaluation Team, however, gave at least one point for items that did not comply with minimum standards, and which technically should have been rated zero, when the team considered the items to be legally enforceable after clarifications were made.

Plaintiff claims Kemmons-Wilson was awarded quality points for five nonconforming items that should have been rated at zero; and it is clear that points were so awarded for at least two nonconforming items. These violations, however, were concerned with omissions within the scope of correction under the RFP, and in fact were corrected at no change in cost after requests were made for clarification. In any event, NAVFAC–ATL's practice was applied equally to all proposals, including plaintiff's. Plaintiff also received at least one point for items that were omitted or which contradicted the RFP, but which could be clarified and changed. In these circumstances, the failure to follow the manual did not prejudice plaintiff and did not have a substantial impact on the ultimate award.

**14.** *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 63, 617 F.2d 590, 598 (1980).

**15.** *Sperry Flight Systems v. United States*, 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977).

**16.** *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

**17.** Id. at 266, 74 S.Ct. at 502.

**18.** *United States ex rel. Brooks v. Clifford*, 409 F.2d 700, 706, *rehearing denied*, 412 F.2d 1137 (4th Cir. 1969).

Plaintiff would have the court recompute Kemmons-Wilson's dollar/point ratios to rectify this failure to comply with the manual. If this type of correction were done for Kemmons-Wilson's proposal, it would have to be done for plaintiff's also. It would require redoing all the work of the Technical Evaluation Team, a task the court is not equipped to perform. The error is not of such significance that requires the administrative determinations to be set aside.

Another violation of the manual involved NAVFAC–ATL's assignment to the Selection Board of two members who knew the identities and bids of the opposing companies. The manual specifically provided that both the Technical Evaluation Team and the Selection Board "will not be aware of the identity of proposers" and, further, that the contracts division representative "having custody of identification of proposers and designated in the RFP as point of contact for contractors, shall not be a member of the Selection Board."

The contracts division representative who was the point of contact was a member of NAVFAC–ATL's Selection Board on the Bermuda project, and the senior member of the Selection Board also knew the identities of the proposing companies. No member of the Technical Evaluation Team knew who the proposers were when point allocations were made.

The purpose of the secrecy requirement was to assure that proposal evaluation was conducted in confidence so that the cost/quality ratio would be fair and objective. The Selection Board accepted without change the point values assigned by the Technical Evaluation Team; computation of the cost/quality ratio thereafter was automatic. On these facts, plaintiff has not been prejudiced and the violation, while contrary to good administrative practice, is

technical and harmless. The secrecy provisions were directed at internal administration of the program, to avoid "criticism and protest from losing proposers"; they were not designed for the protection of proposers. Absent a showing of substantial prejudice, the violations shown by plaintiff of the secrecy provisions, do not amount to arbitrary or capricious conduct.[19]

Plaintiff also claims NAVFAC–ATL violated Turnkey Manual procedures in the practice where the Technical Evaluation Team made its report to the Selection Board orally rather than in writing.[20] The manual provides:

"E. *DOCUMENTATION*

"A report of the Technical Evaluation Team will be forwarded to the Selection Board. This report should summarize the total rating points assigned to each proposal in each of the four major evaluation areas, indicating the total rating points resulting in the ranking of proposals as to quality alone. Furthermore, this report should briefly discuss each proposal, mentioning any notable advantageous or disadvantageous features of that proposal."

It also provides:

"5. *Briefing of the Selection Board.* After technical evaluation of all proposals has been completed, the Selection Board shall be convened and completely briefed by the Technical Evaluation Team Leader on the features and quality rating of each proposal. Should major errors and/or omissions in the evaluation process be noted, the proposals shall be referred back to the Evaluation Team for reconsideration."

The Technical Evaluation Team did not prepare a written report. Each of the team members recorded the points they assigned to the various elements of the proposals they reviewed within their areas of responsibility in their own fashion, generally on

---

**19.** *United States v. Lockyer*, 448 F.2d 417 (10th Cir. 1971) (Violations of internal IRS regulations did not involve procedural due process rights.).

**20.** Plaintiff asserts the failure of the Technical Evaluation Team to make a written report is a

violation of the manual and arbitrary and capricious. This claim is related also to plaintiff's complaint that destruction of the Technical Evaluation Team's workpapers constitutes a violation of ASPR § 1.308.

the applicable pages of Enclosure (3) of the manual that set the ranges for the particular work items. These values were assembled and totals tabulated by the head of the Technical Evaluation Team, who then gave the totals to the Selection Board during the team's report to the board. Each Technical Evaluation Team member presented his evaluation of the items for which he was responsible in an oral report to the Selection Board. During his presentation he was subjected to questions by the board members on various aspects of the proposals.

This procedure was followed to save the time necessary to prepare a written report, and because the commander believed written reports were unnecessary bureaucratic make-work. The manual does not by its terms require a written report. When only two proposers are involved, the matters to be reviewed by the Selection Board are not so complex that a written report would be mandatory.

Plaintiff relies on the practice of other NAVFAC divisions to require written reports to support its version of proper application of the manual. The record is not clear in this regard. At trial, Navy officials who were involved in negotiated procurements testified that Technical Evaluation Team reports frequently were given orally. NAVFAC–ATL's use of oral reports from the Technical Evaluation Team in this case would not amount to arbitrary or capricious action.

As another violation of the procedures established in the Turnkey Manual, plaintiff cites the different methods used by the Technical Evaluation Team and the Selection Board in their treatment of deductible items. The Technical Evaluation Team assigned quality points on the basis of the entire project, without including any of the deductible items. Quality point assessments were made for the Kemmons-Wilson

proposal and for each of plaintiff's major alternate proposals.

The Selection Board applied these quality point assessments to (1) the dollar values for the base bid price less all deductive work, and (2) the base bid price less deductive item No. 7. The Selection Board computed dollar/point ratios for each of plaintiff's major alternate proposals before and after August 26, 1974, the date each price was increased $500,000. After August 26, 1974, each of plaintiff's alternate proposals exceeded Kemmons-Wilson's dollar/point ratio for all deductive work, and its best alternate proposal exceeded the dollar/point ratio of Kemmons-Wilson in the comparison with deductions only for item No. 7. The Selection Board recommended award to Kemmons-Wilson on the base bid and deductive item No. 7.

Plaintiff would have the Technical Evaluation Team assign points on the basis of the base bid and each of the seven deductible items separately and for each combination of deductible items. These point values then would be applied by the Selection Board to the relevant dollar values. Such a myriad of computations is neither required by the manual nor useful in analysis of the proposals. The manual only requires point assessment and dollar/quality ratios for each proposal and its major alternates.[21] This procedure was followed; and each proposal was accorded the same treatment. The reason plaintiff's dollar/point ratios exceeded Kemmons-Wilson's was due to its $500,000 price escalation after August 26, 1974, not to the method used to compute point allocations.

■ In addition to the violations of the Turnkey Manual, plaintiff accuses NAVFAC–ATL of subjective bad faith because it had preselected Kemmons-Wilson for the award. To support this charge,

21. Enclosure (1) of the Turnkey Manual provides in part:

"6. *Calculation of Cost/Quality Ratio.* Once the quality ratings of project proposals have been established, their relative value in terms of proposed price must be taken into account by the Selection Board. This is accomplished by means of a cost/quality ratio. This ratio is calculated by dividing the proposed price by the quality rating established during technical evaluation ($ price ÷ quality rating = $/point). This ratio shall be calculated for each major alternate of every proposal."

plaintiff points to the decision to wait until new funds became available, and to the requirement that a separate contract for water meter pit construction at the Bermuda project utilized Kemmons-Wilson's proposed specifications.

The delay plaintiff points to is the time between August 6, 1974, when it submitted its revised proposals and August 26, 1974, the date its prices escalated $500,000. Plaintiff knew, when it submitted its revised proposal that contract award would be held in abeyance until new funding had been authorized and that NAVFAC–ATL would have 60 days to review the revised proposals. Submission of a revised proposal shows plaintiff's agreement with the proposed procedure. The delay affords no support for the contention that NAVFAC–ATL had decided to award the contract to Kemmons-Wilson at that time.

The fact that the water meter pit contract, awarded September 26, 1974, used specifications that followed the Kemmons-Wilson proposal is without significance. The Selection Board had met on August 12, 1974, and at that time had computed the dollar/point ratios that showed Kemmons-Wilson's proposal would be the best buy after August 26, 1974. In these circumstances, NAVFAC–ATL's decision to utilize the Kemmons-Wilson specifications in an IFB released September 6, 1974, is sensible. It does not establish that NAVFAC–ATL failed to act in good faith in its consideration of plaintiff's proposals.

 In addition to violations of the Turnkey Manual, plaintiff charges NAVFAC–ATL violated the Armed Services Procurement Regulation provisions relative to the maintenance of contract files.[22] The handwritten notes of the Technical Evaluation Team, however, were not part of the official contract file. The notes were the personal work data of the individual members and were not the product of the Technical Evaluation Team as a team. The team's product, the chart with the point totals, is included in the Selection Board's report.

The materials that were destroyed were worknotes, not a team report, and, appropriately were not part of the official file.

Plaintiff emphasizes that the materials were destroyed after it had filed a protest with GAO and had requested all contract documents under the Freedom of Information Act. The decision to destroy the notes at that time, however, does not establish that they were part of the official file required to be maintained under ASPR § 1.308 or that plaintiff received less than fair and honest treatment.

## CONCLUSION OF LAW

On the basis of the foregoing opinion and findings of fact, which are set forth in the trial judge's report which are adopted, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.