LABAT–ANDERSON, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 94–218C.

United States Court of Federal Claims.

Aug. 24, 2001.

David T. Ralston, Jr., Washington, D.C., for plaintiff. With him on the briefs was Karen M. Grane, Washington, D.C.

Martin F. Hockey, Jr., Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him on the briefs were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, and Robert E. Kirschman, Assistant Director. Gary M. Winter, of counsel.

## OPINION

BRUGGINK, Judge.

This is an action to recover bid preparation costs. In an earlier ruling,[1] we granted defendant summary judgment with respect to count II of plaintiff's complaint. We denied defendant summary judgment with respect to count I, plaintiff's bad faith claim, because we identified three unresolved issues related to this claim: (1) the agency's explanation for the contracting officer's decision not to terminate the original contract with the successful bidder and his ultimate ratification of that contract, even though the revised contract price was lower than the original contract price; (2) the agency's justification for lifting the stop-work order on February 18, 1992; and (3) the agency's rationale for reimbursing the successful bidder for legal fees it incurred during plaintiff's first protest of the contract award. Plaintiff subsequently withdrew the first issue from consideration. *See* Order of March 24, 1999. The parties have now completed additional discovery. Pending is defendant's Supplemental Motion for Summary Judgment. For the reasons set forth below, defendant's motion is granted.

## BACKGROUND [2]

On October 4, 1991, after receiving notice that the Agency for International Development ("AID") had awarded the contract for the Black Integrated Commercial Support Network ("BICSN") project to its competitor, Chemonics International, Inc., ("Chemonics"), plaintiff Labat–Anderson, Inc., ("Labat") filed a bid protest with the General Accounting Office ("GAO"). Chemonics incurred costs as a result of its participation in the Government's legal defense during the bid protest.

---

1. *Labat–Anderson, Inc. v. United States,* 42 Fed. Cl. 806 (1999).

2. The facts of this case were set forth in detail in *Labat–Anderson,* 42 Fed.Cl. 806. Here, we state only those facts relevant to the issues now ripe for decision. Except as noted, the facts stated here are undisputed.

On October 16, 1991, Michael Kenyon, the contracting officer for the BICSN project, issued a stop-work order ("First Stop–Work Order") to Chemonics.[3] The First Stop–Work Order stated, "[I]n view of the protest of the award by Labat–Anderson, I must direct you to stop work after the orientation until the protest is decided by the General Accounting Office." The next day, Mr. Kenyon issued a letter to Chemonics that stated, "After the orientation, incur zero costs for AID reimbursement, until I notify you otherwise."

On February 18, 1992, the General Accounting Office ("GAO") sustained Labat's protest and recommended, among other things, that AID request a second round of best and final offers ("BAFOs") from Chemonics and Labat. The GAO's decision also stated, "If Labat–Anderson is ... the successful offeror [after the second round of BAFOs], AID should terminate Chemonics's current contract and award the contract to the protester, if otherwise appropriate." *In re Labat–Anderson Inc.*, 71 Comp. Gen. 252, 260 (1992).

At this point, we must correct an error contained in our January 29, 1999, opinion. In that opinion, we stated that AID "canceled" the First Stop–Work Order on February 18, 1992, "as an immediate result of the GAO decision." *Labat–Anderson,* 42 Fed.Cl. at 823. The facts presented to us in the current briefing demonstrate that our previous finding is inaccurate, and it is now undisputed that AID did not affirmatively cancel the First Stop–Work Order on February 18, 1992.

It does not appear from the record before us that AID took any affirmative action in regard to the First Stop–Work Order on February 18, 1992. Rather, immediately pri-

or to Chemonics's March 12, 1992, oral presentation during the second round of BAFOs, Mr. Kenyon was apprised that Chemonics considered the First Stop–Work Order to have lapsed upon the issuance of the GAO decision.

On March 12, 1992, after learning of Chemonics's assertion that the First Stop–Work Order had lapsed, Mr. Kenyon issued another stop-work order ("Second Stop–Work Order"). The Second Stop–Work Order stated, "I meant the stop work order to continue until the protest resolution permitted performance of the contract. Therefore, I hereby issue a new stop work order, effective today until further notice from me." The Second Stop–Work Order was not lifted until April 10, 1992, after Chemonics's contract was ratified following the second round of BAFOs.

While the stop-work orders were in place, Chemonics submitted claims for reimbursement.[4] AID did not approve these claims prior to the ratification of the Chemonics contract on April 8, 1992. On April 20, 1992, Chemonics submitted a claim for all costs incurred prior to ratification of its contract. In this claim, Chemonics asserted that it was unnecessary for it to segregate costs incurred during the stop-work order periods from those incurred during other periods. Responding to this assertion in a letter of May 1, 1992, Mr. Kenyon stated,

> I will be happy to entertain any request from you for a determination of reasonableness and/or allocability of costs incurred during the stop work order periods, should you choose to make one.

> Until you do, however, only vouchers that request payment for costs clearly incurred during periods in which there were no stop work orders are eligible for reim-

---

3. Chemonics's contract with the AID incorporated by reference FAR 52.212–13, the Stop–Work Order Clause. This clause has since been redesignated FAR 52.242–15. *See* 60 Fed.Reg. 48,251, 48,256 (1995); 48 C.F.R. § 52.242–15 (1998). In our prior opinion, we held that the contract also incorporated FAR 52.233–3, the Protest After Award clause. *Labat–Anderson,* 42 Fed.Cl. at 856.

4. Plaintiff alleges that Mr. Kenyon was aware of these invoices, that the costs reported in these

invoices were "incurred ostensibly in violation of Mr. Kenyon's October 17, 1991 letter," and that Mr. Kenyon "took no action ... to require Chemonics to comply with the October 17, 1991 [letter]." Corrected Pl.'s Proposed Findings of Uncontroverted Fact at ¶ 34. These allegations form the basis for an argument that was not contemplated in our January 1999 opinion and that was not fully addressed in the briefing. We discuss this argument in part III of our discussion.

bursement. If you do not segregate these costs, you are working the fiscal hardship upon yourself.

On May 22, 1992, Chemonics submitted a revised payment request in response to Mr. Kenyon's May 1 letter. The request was for costs incurred during the period from October 16, 1991 to February 29, 1992. Included in this payment request were costs related to the defense of Labat's October 1991 bid protest.

Defendant and plaintiff have conflicting versions of what happened after Chemonics submitted its May 22 revised payment request. For simplicity's sake, we begin with defendant's version. Defendant contends that the next event in the chronology was Mr. Kenyon's issuance, on July 14, 1992, of a response to Chemonics's May 22 revised payment request.[5] In this response, Mr. Kenyon stated,

I have reviewed the rather extensive claim, and ... am prepared to agree to the reimbursement of the salaries of the key personnel long-term field team members whom you maintained on your payroll during the stop-work periods.

I will not agree to the salary, per diem, travel or other expenses incurred by Chemonics' home office personnel during this period, nor to any travel or per diem expenses incurred by Chemonics in bringing field team members to any meetings during the stop-work period. Clearly, this represents activity taken by Chemonics either without the prior knowledge or the prior approval of AID.

. . . .

Please prepare a revised proposal incorporating the costs described above and forward it to me for review.

Defendant contends that Chemonics did not submit the revised proposal ("Revised Proposal") requested in Mr. Kenyon's July 14 letter until August 12, 1992. The first page of the Revised Proposal is dated July

13, 1992, but bears a stamp, apparently placed there upon receipt of the document, that indicates a date of August 17, 1992; defendant contends that the July 13 date is a typographical error. The remaining pages of the document are dated August 12, 1992. This Revised Proposal purported to be "in accordance" with Mr. Kenyon's July 14 letter. The Revised Proposal still contained the legal fees requested in Chemonics's May 22, 1992 revised payment request. AID's project manager, Paul Neifert, authorized payment of the Revised Proposal on September 1, 1992.[6] In his declaration prepared for this case, Mr. Kenyon stated that he does not recall agreeing to pay Chemonics for its legal fees or even discussing this issue with Chemonics.

Plaintiff's version of the chronology between submission of the May 22, 1992, revised payment request and the payment of Chemonics's legal fees in early September 1992 is substantially different. Plaintiff contends that the July 13 date on the first page of the Revised Proposal is accurate and that this demonstrates that Mr. Kenyon provided Chemonics with a draft copy of his July 14 decision prior to its issuance. In further support of its argument that the Revised Proposal was submitted prior to August 12, 1992, plaintiff points to a July 28, 1992, memorandum issued by Mr. Kenyon. This memorandum states,

1. Enclosed is a revision of Chemonics' invoices 1–6. This is in keeping with my determination by letter dated 14 July 1992, of which you should have a copy.

2. Chemonics has accepted my determination as a basis of settlement against their claim. If this revision agrees mathematically with their invoices and my letter, you can use it to pay the invoices/vouchers.

Plaintiff contends that this memorandum demonstrates that Mr. Kenyon had been provided with the Revised Proposal before July

---

5. Plaintiff does not dispute that this response was issued on July 14.

6. Plaintiff "denies [this finding] to the extent [it] implies that payment to Chemonics was authorized by the AID project manager without au-

thority from, or approval of, Mr. Kenyon." There is no evidence offered by plaintiff that Mr. Kenyon knew of this payment at the time it was made.

28. These facts, plaintiff avers, constitute evidence that Mr. Kenyon and Chemonics "closely coordinated on the reimbursement issue." From this and from AID's failure to cancel the Chemonics contract, plaintiff asks the court to infer the exercise of bad faith in the agency's consideration of its bid proposal.

## DISCUSSION

In our previous opinion, *Labat–Anderson*, 42 Fed.Cl. 806, we granted defendant summary judgment with respect to count II of plaintiff's complaint but found that three issues prevented us from granting defendant summary judgment with respect to count I, plaintiff's bad faith claim. As previously noted, one of those issues-the issue of whether Mr. Kenyon's ratification of Chemonics's original contract even though that contract was priced higher than Chemonics's revised contract-was withdrawn.[7] *See* Order of March 24, 1999. The two remaining issues, as articulated in our previous opinion, are (1) the justification for the lifting of the First Stop–Work Order on February 18, 1992, and (2) the rationale for the AID's reimbursement of Chemonics for its legal fees. Plaintiff, in its current briefing and at oral argument, has raised a third issue: whether Mr. Kenyon's failure to take action to prevent the incurrence of costs by Chemonics during the stop-work period when he was allegedly in receipt of invoices for work performed during that period constitutes evidence of bad faith.

### I. The First Stop–Work Order

■ As noted above, the court's earlier finding that the AID canceled the First Stop–Work Order on February 18, 1992, is incorrect. No such cancellation took place. In fact, Chemonics contended that the First Stop–Work Order had lapsed upon issuance of the GAO decision. In response to this contention, the contracting officer issued the Second Stop–Work Order.

Although it is now clear that the First Stop–Work Order was not canceled after the GAO decision was issued, it is also undisputed that the AID did not terminate the Chemonics contract upon issuance of the GAO decision. Plaintiff argues that, under the

FAR, the contracting officer was required to terminate Chemonics's contract after the GAO sustained Labat's protest and that failure to do so constitutes evidence of bad faith on the part of the contracting officer. We reject this argument.

The ultimate question before us is not whether the contracting officer violated a FAR provision. Rather, it is whether the plaintiff has presented sufficient evidence of bad faith on the part of the contracting officer to survive defendant's summary judgment motion. As previously noted, the GAO in its decision recommended that the AID wait until after a second round of BAFOs before deciding to terminate Chemonics's contract. In addition, the contracting officer has submitted an affidavit stating,

> I did not terminate the contract award following the GAO's February 18, 1992 decision because the GAO did not suggest that I terminate the contract. Rather, the GAO suggested that [AID] conduct a second round of best and final offers and if Labat was determined to be the successful offer [AID] should then terminate the original contract award.

Plaintiff has pointed to no evidence indicating that this statement by the contracting officer is untrue.

Instead of pointing to independent evidence demonstrating that Mr. Kenyon's statement in his declaration is not accurate, plaintiff attempts to impeach Mr. Kenyon's credibility and thus draw into question his stated rationale. Plaintiff first alleges that the Second Stop–Work Order issued by Mr. Kenyon contradicts a statement contained in the declaration provided by Mr. Kenyon in this case. In the Second Stop–Work Order, Mr. Kenyon stated,

> I want to thank Mr. Teele for pointing out that [the First Stop–Work Order] against [the Chemonics contract] had inadvertently expired when the GAO decision concerning the protest was announced.
>
> Obviously, I meant the [First Stop–Work Order] to continue until the protest

---

7. Unlike the two issues that remain, the issue of Mr. Kenyon's ratification of the higher-priced

original contract was directly related to AID's consideration of the second round of BAFOs.

resolution permitted performance of the contract.

In his declaration in this case, Mr. Kenyon stated, "I disagreed with Chemonics' interpretation of the [First Stop–Work Order] language." These two statements are not contradictory. Mr. Kenyon pointed out to Chemonics in the Second Stop–Work Order that he "meant the [First Stop–Work Order] to continue until the protest resolution permitted performance of the contract." This differed from Chemonics's interpretation of the First Stop–Work Order. Consequently, Mr. Kenyon's statement in his declaration is consistent with the language of the Second Stop–Work Order.

Plaintiff also alleges that Mr. Kenyon's declaration is inconsistent with a memorandum prepared by Mr. Neifert, in which Mr. Neifert states, "The Regional Contracting Officer [Mr. Kenyon] issued stop work orders during the periods October 16, 1991 through February 18, 1992, and then between March 12, 1992 and April 10, 1992." This statement by Mr. Neifert is irrelevant to a determination of Mr. Kenyon's credibility. The statement does not show that Mr. Kenyon subjectively agreed with Chemonics's interpretation of the First Stop–Work Order, and that is the relevant question here.

In its final attempt to impeach Mr. Kenyon, plaintiff alleges that Mr. Kenyon's statement in his declaration that he "did not conduct a detailed review of Chemonics' invoices prior to the Government's payment of those invoices," is contradicted by Mr. Kenyon's July 14, 1992 letter. In that letter, Mr. Kenyon wrote, "I have reviewed the rather extensive claim, and after consultation with the [AID]/South Africa project manager, am prepared to agree to the reimbursement of the salaries of the key personnel long-term field team members whom you maintained on your payroll during the stop-work period." Again, this statement does not contradict Mr. Kenyon's declaration. In his declaration, Mr. Kenyon stated that he "did not conduct a *detailed* review" of Chemonics's invoices prior to payment. In the July 14 letter, he states that he "reviewed the rather extensive claim." This statement does not indicate that Mr. Kenyon's review was extensive;

rather it indicates that Chemonics's claim was extensive. The July 14 letter contains no statement regarding the rigor of Mr. Kenyon's review. Consequently, the statement contained in his declaration is not contradicted by the July 14 letter.

Plaintiff's sole remaining argument in support of its claim that failure to terminate the Chemonics contract demonstrates subjective bad faith is that the failure to terminate violated the FAR. Even assuming that this contention is true, however, defendant has presented evidence demonstrating that the decision not to terminate the contract was made in good faith reliance on GAO's instructions. Consequently, it became plaintiff's burden to point to evidence that rebuts defendant's explanation. As already noted, plaintiff has pointed to no such evidence. The agency's failure to terminate Chemonics's contract after resolution of Labat's October 1991 protest does not constitute evidence of bad faith by the contracting officer.

## II. Payment of Chemonics's Legal Fees

Before deciding whether there is a genuine dispute between the parties about the factual circumstances surrounding the Government's reimbursement of Chemonics for its legal costs, we must first determine whether the outcome of this dispute is material to the case. Defendant has argued that the manner in which Chemonics was reimbursed for its legal costs is immaterial because the "subsequent payment of legal fees [is] unrelated to the agency's determination that Labat's proposal was no longer within the competitive range[;] [t]hus, Labat can not establish any connection between the allegations of bad faith and Labat's elimination from the competition." Def.'s Supplemental Mot. for Summ. J. at 8–9.

The substantive law identifies which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Here, the law provides that "a losing competitor may recover the costs of preparing its unsuccessful proposal if it can establish that the Government's consideration of the proposals submitted was arbitrary or capricious." *E.W. Bliss Co. v. United States,* 77 F.3d 445, 447 (Fed.Cir. 1996) (quoting *Lincoln Servs., Ltd. v. United*

*States,* 230 Ct.Cl. 416, 678 F.2d 157, 158 (1982)). One of the ways in which a plaintiff can prove arbitrary or capricious conduct is to show that "subjective bad faith on the part of the procuring officials" deprived it "of the fair and honest consideration" of its proposal. *Keco Indus. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203 (1974) (citation omitted).

■ The primary material fact to be proved, therefore, is that Mr. Kenyon, in bad faith, acted in such a way as to deprive Labat of the fair and honest consideration of its proposal. Whether Mr. Kenyon improperly colluded with Chemonics to pay them for legal costs incurred during the stop work periods is irrelevant to this determination, absent some evidence to connect the payment to AID's consideration of Labat's bid. Plaintiff has pointed to no such evidence.[8] Thus, we need not decide whether there is a genuine dispute regarding the manner in which the legal fees were paid.

In any event, at the time of the reimbursement in question here, it was, at the very least, arguable that Mr. Kenyon was permitted to reimburse legal costs associated with Chemonics's participation in the defense of the bid protest. In *Bos'n Towing & Salvage Co.,* ASBCA No. 41357, 92–2 BCA ¶ 24,864 (1992), the Armed Services Board of Contract Appeals ("ASBCA") held that reimbursement of legal fees incurred by an incumbent contractor whose contract was terminated for convenience as a result of a successful bid protest was allowable under the FAR.[9] Given this 1992 holding of the ASBCA addressing the very issue of the allowability of the reimbursement of legal fees incurred during a successful bid protest, we cannot find that reimbursement of Chemonics for its legal costs constitutes evidence of bad faith.

III. Chemonics's Incurrence of Costs During the Stop–Work Period

■ Although not fully developed in the briefing, plaintiff at oral argument averred that Mr. Kenyon's failure to take affirmative steps to prevent the incurrence of costs after Chemonics submitted invoices during the stop-work period indicates that his October 17, 1991, letter to Chemonics directing it to "incur zero costs" was actually a sham and that Mr. Kenyon, from the time the bid protest was filed, planned to reimburse Chemonics for costs it incurred during the stop-work period. Plaintiff further argues that this indicates that Mr. Kenyon, at the time he issued the October 17, 1991, letter, planned to ultimately ratify the Chemonics contract.

We first note that it is not even clear from the record that Mr. Kenyon knew that the invoices were being submitted at the time plaintiff alleges he had knowledge of the submissions. Plaintiff relies on a December 23, 1991, letter by David Himmelfarb, the Project Manager, as evidence that Mr. Kenyon became aware of the invoices in January 1992 at the latest. Mr. Himmelfarb's letter stated,

[W]e have been advised that work under the referenced contract should be placed on hold pending a decision by the GAO on the protest. Mr. Kenyon is currently on leave and I understand will be returning to post on January 7, 1992. I am faxing a copy of your cover letters to him and requesting guidance in terms of what action, if any [AID]/SA can take on the two referenced invoices.

This letter is not direct evidence that Mr. Kenyon received the two invoices from Chemonics upon his return to post, and plaintiff has pointed to no other evidence that Mr. Kenyon knew of those invoices prior to the second round of BAFOs.

Even if Mr. Kenyon knew of the invoices, however, plaintiff's argument fails. Plaintiff's argument relies on a strictly literal in-

---

**8.** Plaintiff's earlier contention that Mr. Kenyon improperly ratified Chemonics's higher-priced original contract, if it were proven true, may have provided such evidence. However, plaintiff has withdrawn this contention.

**9.** Plaintiff argues that *Bos'n Towing* is distinguishable because that case did not involve a stop-work order directing the contractor to "incur zero costs." For reasons we discuss in part III of our discussion, plaintiff's reliance on this phrase is misplaced, and no other facts serve to distinguish *Bos'n Towing* from the reimbursement at issue in this case.

terpretation of Mr. Kenyon's phrase, "incur zero costs." This interpretation is unreasonable. The October 17, 1991, letter itself contemplates the incurrence of some costs, i.e. those incurred in regard to the orientation. Mr. Kenyon's May 1, 1992, letter also indicates that he did not intend for his directions to Chemonics to trump the FAR's provisions regarding the incurrence and reimbursement of costs during stop-work periods. In the May 1 letter, Mr. Kenyon stated, "Costs incurred during the period of stop work orders by their nature must comply with the concept of 'reasonable steps to minimize incurrance' [sic], and they must be allocable to the work covered." This statement indicates that Mr. Kenyon never intended to direct Chemonics to incur absolutely no costs related to the contract during the stop-work period.[10] Rather, consistent with the FAR, Mr. Kenyon intended to direct Chemonics to minimize costs. Thus, his inaction following Chemonics's submission of invoices for work performed during the stop-work period is consistent with his issuance of the stop-work orders, including the October 17, 1991, letter, and, therefore, does not constitute evidence of bad faith.

## CONCLUSION

Government officials are presumed to act in good faith. For the court to proceed further in this protracted litigation, plaintiff would have to offer support for contentions which, together, might support a finding of bad faith by the agency in the decision to award to Chemonics. While there were problems and mistakes in this procurement, nothing plaintiff offers, even if unrebutted, would constitute such evidence. Accordingly, defendant's Supplemental Motion for Summary Judgment is granted. The Clerk is directed to enter judgment in favor of defendant. Each side to bear its own costs.

10. Even if Mr. Kenyon had truly intended for Chemonics to incur absolutely no costs, this limitation would have gone beyond what the regulations required.