**E.W. BLISS CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 94–371C.**

United States Court of Federal Claims.

March 31, 1995.

Issued for Publication April 13, 1995.[1]

---

1. This opinion was filed on March 31, 1995, subject to a protective order. By separate order the parties were directed to designate protected material in the opinion that should be redacted.

The opinion now issued for publication redacts all the material designated by the parties. Redactions are indicated by brackets.

Richard A. Degen, Mascoutah, IL, for plaintiff.

Dean L. Grayson, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant. Irwin Ansher, U.S. Mint, of counsel.

## OPINION

MILLER, Judge.

This suit to recover costs incurred in preparing technical and cost proposals is before the court after argument on cross-motions for summary judgment.[2] The issue for resolution is whether the Government's award of a contract to an offeror other than plaintiff was arbitrary and capricious because, *inter alia*, the procuring agency accepted an allegedly non-responsive technical proposal.

## FACTS

The following facts are undisputed, unless otherwise noted. On July 28, 1993, the United States Department of the Treasury, Unit-

---

2. The complaint also asks the court to set-aside the award of the subject contract. This equitable remedy is not available to plaintiff because suit was filed after the agency awarded the contract. *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1372 (Fed.Cir.1983). The Court of Federal Claims' equitable "power can be invoked only by filing a claim with the court before a contract is awarded...." *Id.*

ed States Mint (the "Mint"), issued Request for Proposals Solicitation No. USM 93–14 (the "RFP") for Contract No. TM 93–1073, which contemplated the refurbishment and remanufacture of coin presses, as a small business set-aside. The solicitation determined the feasibility of refurbishing and re-manufacturing the Mint's aging coin presses at a reasonable price. The goal of the proposed press remanufacture program was to provide coining presses that met or exceeded the original factory specifications, while incorporating the latest industrial standards, mechanical components, governmental safety requirements, and advanced control technology.

The RFP required each potential offeror to submit both cost and technical proposals. The cost proposals were to include six pricing schedules requiring fixed-price estimates for nine equipment and related repair service contract line item numbers ("CLINS"). Potential offerors were initially to provide prices for a base year and two option years for coin presses located in Philadelphia, Pennsylvania; and Denver, Colorado. The base year initially was established to run from the date of the contract award to September 30, 1993. The duration of the first option year was October 1, 1993, through September 30, 1994. The second option year began October 1, 1994, and ended on September 30, 1995.

The RFP further required the contractor to provide all labor, engineering, materials, tools, and equipment necessary to pickup, rebuild, remanufacture, test, deliver, and reinstall the existing coining presses. In addition to required repairs, potential offerors were encouraged to provide recommendations that might improve the operation of the coin presses or otherwise benefit the coin production process. The RFP called for the award of an indefinite-quantity contract. Pursuant to this contract, performance by the contractor was authorized only by orders issued in accordance with the contract's Ordering Clause. The contract incorporated Federal Acquisition Regulation ("FAR") § 52.216–18, 48 C.F.R. § 52.216–18 (1984). The Ordering Clause stated that any services furnished under the contract should be ordered by the issuance of delivery orders.

The RFP provided that the contract would be awarded to the responsible offeror whose conforming offer would be most advantageous to the Government. However, the Mint could accept other than the lowest offer and award the contract on the basis of initial offers received, without discussion. Barring a qualified offer, the RFP authorized the Mint to accept any item or group of items of an offer and permitted an award on any item for a lesser quantity than the quantity offered.

The RFP specified five technical evaluation criteria to be considered in reviewing, evaluating, and scoring each technical proposal received. These factors were, in descending order of importance: 1) technical and performance features; 2) similar design/manufacturing experience; 3) quality control; 4) customer references; and 5) delivery schedule. A technical evaluation panel (the "TEP"), was to be set up to evaluate the proposals in order to provide both quantitative and qualitative descriptions of each technical proposal. The RFP also advised that each cost proposal would be reviewed and analyzed for cost reasonableness. With respect to cost proposals, the RFP stated that "[a]s offers become technically equal the importance of cost will increase. . . ."

On July 28, 1993, the Mint issued Amendment No. 0003 to all four offerors, including E.W. Bliss Co. ("plaintiff") and Pressmasters of Delaware Valley, Inc., ("Pressmasters"). The stated purpose of this amendment was to amend the RFP, as follows:

1. Delete pages 2 through 11 and replace with revised pages 2 through 11.

2. Delete pages 18, 34, and 76. Replace with revised pages 18, 34, and 76.

The amendment also stated that "[a]ll terms and conditions remain unchanged." Amendment No. 0003 also included a replacement page for page 40 of the RFP. This replacement page contained a change regarding FAR § 52.216–18, the contract's Ordering Clause. The amended Ordering Clause read: "Ordering (APR 1984): (a) Contract award through September 30, 1994." Each offeror

signed and returned Amendment 0003 to the Mint by September 14, 1993.

On August 6, 1993, the Mint conducted a pre-proposal conference in Philadelphia. Representatives of the Mint, plaintiff, Pressmasters, and other prospective offerors attended the conference. In response to questions raised at the conference, the Mint issued Amendment No. 0001 to the RFP. The purpose of the amendment was to relay information generated by the question-and-answer session. The amendment contains the following exchange:

Q. How will we be able to determine if the crank shaft [sic] is good without disassembling the presses?

A. The proposal should address a new crankshaft to insure consistencies between the new remanufactured presses. All old components removed from the presses shall be returned to the Mint for use as spare parts.

A subsequent amendment was issued that is not germane to the case.

The Mint received four proposals by August 30, 1993, the due date. These proposals were forwarded to the six-member TEP for review. On September 1 and 2, 1993, the TEP analyzed and scored the four technical proposals submitted in response to the RFP. These scores were set forth on individual scoring sheets. The evaluation factors were weighted, as follows: 1) technical and performance features (50 points); 2) similar design/manufacturing experience (25 points); 3) quality control system (12.5 points); 4) customer references (6.25 points); 5) delivery schedule (3.125 points). The total number of points possible was 100. Plaintiff and Pressmasters' scores follow:

| Evaluator | Criteria | Plaintiff | Pressmasters |
|---|---|---|---|
| Adler | Technical features<br>Similar design<br>Quality control<br>Customer reference<br>Delivery schedule | [redacted material] | |
| Claybrook | Technical features<br>Similar design<br>Quality control<br>Customer references<br>Delivery schedule | | |
| Gecys | Technical features<br>Similar design<br>Quality control<br>Customer references<br>Delivery schedule | [redacted material] | |
| Felix | Technical features<br>Similar design<br>Quality control<br>Customer references<br>Delivery schedule | | |
| Smith | Technical features<br>Similar design<br>Quality control<br>Customer references<br>Delivery schedule | | |
| Wolff | Technical features<br>Similar design<br>Quality control<br>Customer references<br>Delivery schedule | | |

After combining all of the evaluators' scores, plaintiff's and Pressmasters' technical proposals were rated, as follows:

| | Plaintiff | Pressmasters |
|---|---|---|
| Technical features | [redacted material] | |
| Similar design | | |
| Quality control | | |
| Customer references | | |
| Delivery schedule | | |

---

Plaintiff's average numerical score was 78; that of Pressmasters, 81. Both plaintiff and Pressmasters were evaluated as "excellent" with respect to quality. The other two prospective contractors, Enprotech and Colombia Machine, received average numerical scores of [redacted material] and [redacted material] respectively, while the qualitative description for both firms was "average."

By memorandum dated September 3, 1993, Barry Claybrook, the Committee Chairman at the Mint and one of the TEP evaluators, summarized the evaluation performed by the TEP. Mr. Claybrook noted that all proposals addressed the "solicitation by proposing the type of components to be used in the remanufacture of the equipment, methods of performing the work, and how the inspection results would be collected and analyzed." All of the proposals, except for that of Pressmasters, "focused on meeting the minimum requirements stated in the solicitation." By contrast, Pressmasters "proposed improvements over and beyond the solicitation." Mr. Claybrook's memorandum contains the following summary of plaintiff's proposal:

> [Redacted material]. Bliss has a total quality control system in use at their facility which includes certifications from equipment suppliers, engineering and management involvement, and recording of actual component dimensions. Customer references were supplied with customer names, phone numbers, etc. [Redacted material].

Pressmasters' proposal was described, as follows:

> [Redacted material].

Mr. Claybrook went on to state that "Pressmasters and Bliss had the highest overall technical scores.... [and] provided very good technical features in addressing the solicitation, but lacked in the other four evaluation criteria...." Finally, he stated that "[i]t is recommended to pursue the highest overall technical offerors (Pressmasters and [plaintiff]) for selection in awarding this contract. However, the cost reasonableness of each [sic] these offerors should be factored into the overall selection process to provide the best value to the Government."

Between September 21 and September 28, 1993, the Mint prepared a document purporting to be a price analysis of the offerors' cost proposals. The document listed the offerors' proposed prices for anticipated line items. The document stated that "[i]n accordance with FAR 15.805-2(a), a comparison of proposed prices received in response to the RFP was performed, which revealed that Pressmasters of Delaware Valley, Inc.'s total price of $530,600 for the above line items has a differential of between [redacted material] and [redacted material] when compared to the other offers...." Moreover, Pressmasters' proposed prices were compared to a government estimate that had been computed using the averages of the four offerors. The document continued:

The outcome of the comparisons of Line Items B.1.1, B.1.1.2, B.2.1, and B.2.2 showed that all offers were extremely variable in those areas. However, because of the insignificance of these items and because of the narrow range of offers under the most consequential line item, Line Item B.1.1, the totals for the Government estimate and other offers when compared to Pressmasters, were within a range of between [redacted material] (Government estimate) to [redacted material], which may indicate from a price standpoint that all parties are adequately aware of what may be required of the work.

The " 'PROPOSAL EVALUATION' " in the solicitation (Clause M.3, and specifically Clause M.3.2) calls for the evaluation of cost proposals only for cost realism (In this case, price reasonableness).... 

The price analysis also recorded that "based on the evaluation of comparison of offers and with the independent Government estimate, the Government has little to gain from discussions...." The document concluded: "By comparison with other prices offered and with the independent Government estimate, in accordance with FAR 15.805–2(a) and (e), the price offered by Pressmasters of Delaware Valley[,] Inc. is determined to be fair and reasonable and is technically superior to the other offers (See Technical Evaluation)." This initial price analysis dealt solely with the offeror's base year proposals. Because the Mint did not make a contract award prior to the expiration of the base period, this price analysis did not form the basis of the award.

By letter dated October 28, 1993, the Mint informed the unsuccessful offerors, including plaintiff, that Pressmasters was the apparent successful offeror. The contracting officer also informed the unsuccessful offerors that the Government would not consider any revisions to the proposals.

On October 29, 1993, the Mint completed a second price analysis of the offerors' cost proposals. In a document captioned "Price Negotiation Memorandum," the Mint combined an analysis of the technical and cost proposals. This document dealt with the offerors' first option-year proposals. The memorandum stated, in part, that "[t]he proposals received from Pressmasters, E.W. Bliss ... were submitted with adequate technical details that written clarification of their proposals was deemed unnecessary." The memorandum elaborated:

The Price Analyses were done in FY 93 and assumed an award would be made in FY 93. However, since award was delayed until FY 94 AND because the final award will only include the Line Items discussed in Paragraph 1, an updated price analysis is provided below to reflect only those items and quantities actually awarded. This revised price analysis coupled with the technical evaluation scores above clearly shows [sic] award to PRESSMASTERS provides the Best Value to the Government. Item B.4 is for rebuilding presses at the Philadelphia Mint. Item B.5 is for rebuilding presses at the Denver Mint. In both cases the subtotal is multiplied by 2 since two presses from each location will be rebuilt.

PLAINTIFF PRESSMASTERS

| | |
|---|---|
| B.4.1 | [redacted material] |
| B.4.1.1 | |
| B.4.1.2 | |
| Subtotal | |
| ×2 | |
| | |
| B.5.1 | |
| B.5.1.1 | |
| B.5.1.2 | |
| Subtotal | |
| ×2 | |
| | |
| Total | $564,776 $530,600 |

Contracting Officer Barry E. Kearns noted in the memorandum that the contract price was fair and reasonable based on a comparison with prices received in response to the solicitation and with independent government price estimates. The memorandum concluded that Pressmasters should receive the award "because it is the responsible bidder whose offer conforms to the solicitation and is the most advantageous to the Government considering price and other factors included in the RFP...."

On November 1, 1993, plaintiff filed a protest with the Comptroller General of the General Accounting Office (the "GAO"). The

document stated that "[i]t is believed that Protestor's price is less than the award price, and that the award should have been made to Protestor." The document described no other grounds for protest. On November 4, 1993, plaintiff filed its "First Amended Protest." Plaintiff argued that the Mint had violated the Ordering Clause of the contract, which required that delivery orders be issued up to September 30, 1993. Plaintiff contended that this delivery period had expired before any supplies were ordered. This protest also stated that "[t]he agency intends to award not under the base year ... of the indefinite-quantity contract, but under the first option year ... which violates the terms and conditions of the solicitation and the evaluation procedures contained therein."

On November 10, 1993, Joseph N. Hoback, Assistant Director for Procurement at the Mint, prepared a memorandum purporting to justify the decision to award the contract to Pressmasters, notwithstanding the protest. Mr. Hoback stated:

> Since the protest has been lodged before award, the Federal Acquisition Regulation (FAR) and the Treasury Acquisition Regulation ('TAPR') require that any decision to award in the face of this protest must be based on urgent and compelling circumstances and such decision must also be approved by the head of the Bureau.

Attached to this memorandum was a document entitled "Determinations and Findings" prepared by Contracting Officer Kearns.

This document specified two "urgent and compelling" reasons for awarding the contract in the face of the protest. First, Mr. Kearns noted that the feasibility of building the presses had to be known in time to submit the necessary funding requests for the fiscal year 1996 budget, due in March 1994, and for the final budget, due in June 1994: "Submission of this requirement in the FY 96 budget is urgent in order to ensure the Mint can meet the rising demand for coin production which has averaged an increase of 35% over the last two years and is projected to rise further." Second, the contracting officer noted that the Mint was in danger of losing its "R & D" funds because "[u]nobli-

gated R & D funds over two years old are subject to being taken back by OMB."

On November 22, 1993, the Mint sent a "Notice of Award" to Pressmasters. This document reported that the award was made under contract line items B.4.1, B.4.1.1, B.4.1.2, B.5.1, B.5.1.1, and B.5.1.2. The award was a partial award pursuant to a contractual provision allowing such awards.

On December 8, 1993, Mr. Kearns prepared a statement addressing the allegations contained in plaintiff's Protest and First Amended Protest. Mr. Kearns noted that plaintiff's asserted belief that its cost proposal was less than Pressmasters' was unfounded and that, at any rate, the Government was seeking a "best value" procurement that allowed the Mint to consider various factors other than price. Mr. Kearns also addressed plaintiff's contention that the Mint intended to award the contract under the first option year and not under the base year:

> It is true that we awarded those line items dealing with prices for the period of October 1, 1993 to September 30, 1994, but since the Protestor does not state how he believes the terms and conditions of the evaluation procedures have been violated, it is not possible for me to address this point precisely. I can only say that at the time the award was made, I used the pricing for the period in which award was made. The protestor was requested in the solicitation to provide an offer acceptance period of 60 days. He was, therefore, on notice the award could have been made after September 30, 1993.

Mr. Kearns noted that plaintiff provided no GAO decisions, court cases, or specific FAR or solicitation references to support the allegations made. The statement concluded by recommending that the GAO summarily dismiss the protest.

On December 15, 1993, plaintiff submitted a document to the GAO entitled "Notice of Additional Protest Grounds." The "Additional Protest Grounds" focused on the Mint's alleged waiver of a contract specification for Pressmasters, specifically the requirement that all offerors include a new crankshaft for each of the remanufactured coin presses. Amendment 0001 to the RFP

had stated that proposals "should address a New crankshaft to insure consistencies between the new remanufactured presses. All Old components removed from the presses shall be returned to the Mint for use as spare parts." Plaintiff noted that Pressmasters, under all contract line items in its cost proposal, had inserted the following: *"OPTIONAL:* NEW CRANKSHAFT & BRAKE/ CLUTCH ......... $17,400.00." Thus, according to plaintiff, Pressmasters did not include new crankshafts in its technical proposal, and Pressmasters' bid was therefore "nonresponsive." Plaintiff further noted that, even if Pressmasters' proposal were deemed responsive, it was improper to decrease a material specification without amending the RFP so that offerors could adjust their proposals accordingly.

By letter dated December 20, 1993, Richard S. Ruck, President of Pressmasters, informed the Mint that, pursuant to Amendment 0001, the proposal submitted by Pressmasters does " 'address a new crankshaft.' " Mr. Ruck went on to state that "[u]nder options page 10 of our technical proposal we list a new crankshaft along with a new clutch since a new DESIGNED crankshaft would have to be provided IF a new clutch was ordered."

On January 13, 1994, Mr. Kearns prepared a "Contracting Officer's Statement" discussing the additional protest grounds contained in plaintiff's December 15, 1993 letter. With respect to the requirement for a new crankshaft, Mr. Kearns stated:

> It is clear from reviewing page 10 of the proposal ... that Pressmasters recommended an entirely different brake/clutch assembly and a different crankshaft to properly support their recommended brake clutch assembly. In no way is this "recommended" or "optional" item to be confused with the new crankshaft required by Amendment 0001. Pressmasters will provide a new crankshaft as required by that amendment. As a final point, the Mint did not make award based on this "recommended" item. To ensure there is no confusion on this issue and to allay any further concerns, Pressmasters was asked to provide, and subsequently did provide, a

letter ... affirmatively stating their compliance with Amendment 0001.

Mr. Kearns also noted that the Government would obtain the new crankshaft from Pressmasters at the prices stated in the contract proposal. He concluded by stating: "The awardee intends to provide a new crankshaft as required by the solicitation. Therefore, no action, other than allowing the current contract to continue, is deemed appropriate."

By letter dated March 7, 1994, Behn Miller, an attorney-advisor for the GAO, submitted four "questions for the record" to the Mint. The GAO required answers to these questions in order to resolve the protest. These four questions, along with two additional items, were discussed at a March 8, 1994 telephone conference involving Mr. Miller, various Mint personnel, and Richard A. Degen, plaintiff's attorney. By letter dated March 9, 1994, Mr. Miller confirmed the agency's responses to these questions. In particular, Mr. Miller noted, with respect to the first question, that the agency asserted that the RFP's requirement for a new crankshaft was mandatory pursuant to Amendment 0001. With respect to the second question, Mr. Miller noted that the agency asserted that it did not make award for the new crankshaft item listed in item 10 of the awardee's proposal, since this item was part of an optional new clutch/brake assembly, which the agency did not want to procure as part of the retrofit operations at that time. Moreover, Mr. Miller noted:

> The agency assert[ed] that the awardee's proposal otherwise demonstrates an offer to propose a new OEM crankshaft part since this was a mandatory requirement of Amendment No. 0001. The agency assert[ed] that all offerors understood that they were to propose a new OEM crankshaft part as [sic] a minimum requirement of the solicitation. The agency further state[d] that no offeror specifically stated that an OEM crankshaft part would be provided in its proposal as all offerors understood the new OEM crankshaft item was a minimum requirement of the RFP, based on amendment No. 0001.

With respect to the third question, Mr. Miller noted the following:

The GAO reported that it did not see how the awardee's December 20 letter ... clarified that the awardee was providing a new OEM crankshaft part. The agency asserts that the letter clearly shows the awardee intends to provide a new crankshaft as part of its base proposal price. This office suggested that the agency re-read the December 20 letter to see if that is still the agency's position.

Finally, with respect to the fourth question, Mr. Miller noted that the agency reported that Pressmasters was committed to providing a new crankshaft and that, indeed, Pressmasters already had provided new crankshaft parts at no extra cost to the agency.

Two additional matters were discussed at the March 8, 1994 telephone conference and recorded in Mr. Miller's March 9, 1994 letter. First, the GAO asked the agency, hypothetically, whether the Mint would have made the award to Pressmasters had the Mint factored the cost of the four new optional $17,400.00 crankshaft parts into its price analysis. These costs would have made Pressmasters' cost proposal [redacted material] percent higher than plaintiff's cost proposal. Mr. Miller recounted that the agency declined to answer this question because "it was not part of the selection decision." According to Mr. Miller, the agency admitted that it made the award to Pressmasters for the base line item prices without factoring the cost of the $17,-400.00 optional crankshafts. The second additional matter concerned whether the awardee had included the cost of the new clutch in its proposal. Mr. Miller noted that the Mint declined to address this matter "as [it] is proprietary." However, the GAO stated that it would take the matter under advisement and consider it in reviewing the record.

By letter dated March 10, 1994, attorney Degen responded to two of the issues raised during the March 9, 1994 teleconference. Both issues dealt with the requirement for a new crankshaft. First, Mr. Degen stated that "[p]rotestor's position is that awardee did not commit itself to supply either a new OEM crankshaft or a new, improved crankshaft, and in fact made the ordering of a new crankshaft an optional item, which the agency did not exercise." Mr. Degen went on to state that Pressmasters violated the terms and conditions of the RFP by not describing in its technical proposal the crankshaft that it intended to furnish on a firm-price basis. Second, Mr. Degen stated that the Mint "did not merely call for a 'replace the wear items' approach by offerors but one that incorporated the latest technology." According to Mr. Degen, plaintiff offered a technologically improved crankshaft and factored the cost of an improved crankshaft into its cost proposal. By contrast, Mr. Degen proceeded, Pressmasters not only failed to mention a new crankshaft, but made the furnishing of a new crankshaft an option costing an additional $17,400.00 each. Mr. Degen stated: "By rightfully including performance/reliability enhancements in its proposal, protester was led into a trap by the agency and the Comptroller must not condone such behavior."

By letter dated March 10, 1994, Mr. Kearns reiterated the Mint's position that Pressmasters was required to provide a new crankshaft pursuant to Amendment 0001 and was then doing so for each retrofit. The letter also stated:

Our interpretation of the [December 20, 1993] letter is the first paragraph shows the awardee is bound by the new crankshaft requirement of Amendment 0001. The second paragraph explains the new crankshaft to be provided if the optional brake and clutch assembly was ordered, and in fact specifically refers to page 10 of the awardee's technical proposal. This option is completely unrelated to the requirement in Amendment 0001.

On April 26, 1994, the Comptroller General issued a decision denying plaintiff's protest. *E.W. Bliss Co.*, B–255648.3, 94–2 Comp.Gen. ¶ 280 (1994). The Comptroller General concluded: 1) The ordering period had not expired because it had been extended; 2) the partial award was proper pursuant to the provisions of the contract; and 3) since Amendment 0001 concerning the requirement that each offeror address a new crankshaft was ambiguous, the Mint reasonably interpreted Pressmasters' proposal, and in particular that portion dealing with the requirement for a new crankshaft, as meeting all of the RFP's specifications. On June 6,

1994, plaintiff filed the instant complaint requesting reimbursement of bid preparation costs and attorneys' fees based on the allegedly unlawful award to Pressmasters.

## DISCUSSION

### I. *Standard of review*

 Expenses incurred in preparing bid proposals are normally a cost of doing business that are lost "when the effort to obtain the contract does not bear fruit...." *Lincoln Servs., Ltd. v. United States,* 230 Ct.Cl. 416, 417, 678 F.2d 157, 158 (1982). A disappointed competitor, however, may recover the costs of preparing its unsuccessful bid if it establishes that the procurement officials' award decision was arbitrary and capricious. *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 65, 617 F.2d 590, 597 (1980); *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203 (1974) (*Keco II*); *Keco Indus., Inc. v. United States,* 192 Ct.Cl. 773, 784, 428 F.2d 1233, 1240 (1970) (*Keco. I*). "The standards that permit a disappointed competitor to recover proposal preparation expenses are high and the burden of proof is heavy." *Lincoln,* 230 Ct.Cl. at 417, 678 F.2d at 158. The final determination of arbitrary and capricious conduct "should be based on the particular circumstances of each case...." *Keco I,* 192 Ct.Cl. at 784, 428 F.2d at 1240.

 *Keco II* sets forth the standard for recovery of bid preparation costs. The Court of Claims listed four "criteria" used in determining whether an agency's award decision is arbitrary and capricious. *Keco II,* 203 Ct.Cl. at 574, 492 F.2d at 1203–04. First, subjective bad faith on the part of procurement officials that prevents the "fair and honest consideration" of the bidder's proposal may form the basis for entitlement to bid preparation costs. *Id.* (citing *Heyer Prods. Co. v. United States,* 135 Ct.Cl. 63, 140 F.Supp. 409 (1956)). Bad faith is particularly difficult to prove because government officials are presumed to act in good faith. *Torncello v. United States,* 231 Ct.Cl. 20, 45, 681 F.2d 756, 771 (1982). Second, an award decision that has " 'no reasonable basis' ... will also suffice, at least in many situations."

*Id.* (quoting *Continental Business Enters. v. United States,* 196 Ct.Cl. 627, 637–38, 452 F.2d 1016, 1021 (1971)).

 In *Keco II* the Court of Claims noted: "Although based on external facts and circumstances rather than a showing of animosity toward plaintiff or favoritism for a competitor, ... [the principle of unreasonableness] is not far removed from the bad faith test; courts often equate wholly unreasonable action with conduct motivated by subjective bad faith...." 203 Ct.Cl. at 575, 492 F.2d at 1204 (citation omitted). Subsequently, in *Burroughs,* the Court of Claims appeared to extend this point, noting that when bad faith is not alleged, "it is highly unlikely the conduct of the Government can be said to have had 'no reasonable basis.'" 223 Ct.Cl. at 65, 617 F.2d at 597. Plaintiff does not allege bad faith. Transcript of Proceedings, *E.W. Bliss Co. v. United States,* No. 94–371C, at 30 (Fed.Cl. Jan. 30, 1995).

 Third, the degree of discretion granted to procurement officials is a relevant factor in determining whether a particular award decision was arbitrary and capricious. *Keco II,* 203 Ct.Cl. at 575, 492 F.2d at 1203–04 (citations omitted). In negotiated procurements, such as in this case, procurement officials possess a high degree of discretion in their efforts to obtain a contract most beneficial to the Government. *Burroughs,* 223 Ct.Cl. at 65, 617 F.2d at 598 ("Because of the breadth of discretion given to the contracting officer in a negotiated procurement, the burden of showing this discretion has been abused, and that the action was 'arbitrary and capricious' is certainly much heavier than it would be in a case of formal advertising.").

 Fourth, the violation of relevant statutes and regulations may, "but need not necessarily," provide a basis for recovery. *Keco II,* 203 Ct.Cl. at 574, 492 F.2d at 1204 (citing *Keco I,* 192 Ct.Cl. at 784, 428 F.2d at 1240); *Burroughs,* 223 Ct.Cl. at 65, 617 F.2d at 597. A proven violation must somehow prejudice the competitor or otherwise have a "substantial impact" on the award decision. *Lincoln,* 230 Ct.Cl. at 428–29, 678 F.2d at 164. The application of these principles to a

particular case depends on the type of "error or dereliction" committed by the procurement officials and whether such conduct occurred with respect to the protestor's bid or that of another offeror. *Keco II*, 203 Ct.Cl. at 574, 492 F.2d at 1204; *accord Burroughs*, 223 Ct.Cl. at 65, 617 F.2d at 597.

■ In *Keco II* the Court of Claims described the extent to which these principles might apply to various factual situations. 203 Ct.Cl. at 574–78, 492 F.2d at 1204–05. In most situations bad faith or unreasonable official conduct would suffice to entitle a disappointed offeror to bid preparation costs. *Id.* The court left open the possibility that mere negligence may, under certain circumstances, suffice for recovery. *Id.*

The Court of Claims also elaborated upon its observation that different rules may apply when the agency's error relates to the evaluation of a proposal submitted by an entity other than the protestor. The selection process is a comparative one, and "government actions favoring another bidder—without any misreading or misevaluation of claimant's own bid—prejudice the complainant's chances for the award...." *Keco II*, 203 Ct.Cl. at 576, 492 F.2d at 1205. Therefore, "in those cases where dishonesty and bad faith are absent, the rules governing the claimant's rights when the Government errs with respect to ... [the claimant's] *own* bid need not automatically be carried over, in every instance, to the comparable situation where the objective error solely concerns a competitor's proposal." *Id.*, 203 Ct.Cl. at 576–77, 492 F.2d at 1205 (emphasis in original). "The procuring agency's enforceable responsibility to a bidder to read or evaluate properly his competitor's bid may be appreciably less in certain situations...." *Id.*, 203 Ct.Cl. at 577, 492 F.2d at 1205.

■ The Court of Claims advised that "in those instances in which the alleged Government wrongdoing concerns only the prevailing bid and not the claimant's own rejected proposal, there should be careful examination of the claimant's particular rights and interests with respect to that specific type of misconduct...." *Keco II*, 203 Ct.Cl. at 578, 492 F.2d at 1206. Therefore, a competitor whose own bid has not been misevaluated

possesses a limited right to bid preparation costs. This lesser status derives from the rule that an agency's duty to fairly and honestly consider a particular proposal runs first to the offeror submitting that proposal. *Id.*, 203 Ct.Cl. at 577, 492 F.2d at 1205. The court noted that there may be no single "umbrella rule" that governs situations in which the awardee's, and not the protestor's, proposal has been misevaluated by the agency. *Id.*, 203 Ct.Cl. at 578, 492 F.2d at 1206.

■ The Comptroller General specifically considered three of the many arguments that plaintiff makes in support of its present motion. *See E.W. Bliss Co.*, B–255648.3, 94–2 Comp.Gen. ¶ 280 (1994). Traditionally, decisions by the Comptroller General have been accorded a high degree of deference by the courts, particularly those decisions involving bid protests. *E.g., M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1304–05 (D.C.Cir.1971); *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 325 F.2d 438 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964). "A court's reluctance to interfere with the executive procurement process should be especially strong where, as here, the ... [GAO] has made a determination upholding the procurement officials on the merits." *M. Steinthal*, 455 F.2d at 1304. However, "[t]he Court of Claims is not bound by the views of the Comptroller General nor do they operate as a legal or judicial determination of the rights of the parties...." *Burroughs*, 223 Ct.Cl. at 63, 617 F.2d at 597 (citing *Font v. United States*, 219 Ct.Cl. 335, 593 F.2d 388 (1979)).

In *Honeywell, Inc. v. United States*, 870 F.2d 644 (Fed.Cir.1989), the contracting officer deemed that one of several bidders on an Army procurement contract had submitted a non-responsive bid. The Comptroller General found to the contrary and recommended that the Army award the contract. The Army adopted this recommendation. The second lowest bidder filed suit in the Claims Court to enjoin the award. The Claims Court disagreed with the Comptroller General's decision, concluding that " '[t]here is no rational basis upon which such a determination can be based....' " 870 F.2d at 647

The Federal Circuit's application of a rational basis standard in *Honeywell* appears inconsistent with the standard governing review of GAO decisions articulated in *Burroughs*. However, the decision in *Honeywell* was crafted specifically to deal with the analysis of the lower court's opinion, which focused on whether the GAO's decision concerning the responsiveness of a bid had a rational basis. The Claims Court in *Honeywell* did not accord due weight and deference to either the GAO's or the contracting officer's decision. The Federal Circuit criticized the lower court for undertaking an independent *de novo* analysis of the responsiveness of the bid documents. Such an undertaking is improper because the appropriate focus is on the reasonableness, or rationality, of the procurement official's determination. *Parcell 49C Ltd. Partnership v. United States*, 31 F.3d 1147, 1153 (Fed.Cir.1994) (citing *Honeywell*, 870 F.2d 644).

Accordingly, *Honeywell* cannot be read to supplant *Burroughs*, nor to confer on the GAO a degree of deference beyond that delimited in *Burroughs*. The weight of precedent instructs that, although the review is not *de novo* and the GAO's decision is accorded deference, the court is to answer the question whether the agency's procurement decision or the GAO's decision on the protest was reasonable based on the record before the contracting officer or the GAO.

## II. *Plaintiff's challenges*

Plaintiff levels 13 numbered challenges at the procurement process. Each will be discussed individually, although it should be noted that the procurement process itself is not on trial, and the court's function is not to second-guess the procurement process. *Keco II*, 203 Ct.Cl. at 579, 492 F.2d at 1207.

█ 1. Plaintiff argues that the contract award to Pressmasters is void because the Mint failed "to order supplies/services in a timely manner." Plf's Br. filed Aug. 25, 1994, at 9. According to plaintiff, the deliv-ery orders were untimely because the original ordering period had lapsed on September 30, 1993. Pursuant to Federal Acquisition Regulation ("FAR") § 52.216–18, 48 C.F.R. § 52.216–18 (1984), the contract's Ordering Clause, the awardee was to provide only those services authorized by delivery orders issued within the period specified. This clause provides: "Contract award through September 30, 1993." The Mint, however, did not issue delivery orders until on or about November 22, 1993.

Plaintiff contends that Amendment 0003 did not extend the ordering period, because the Mint did not adequately notify plaintiff of the purported extension. The cover sheet of Amendment 0003 states that its purpose is to "[d]elete pages 2 through 11 and replace with revised pages 2 through 11.... [and] [d]elete pages 18, 34, and 76. Replace with revised pages 18, 34, and 76." The amendment also states that "all terms and conditions remain unchanged." However, in addition to the revisions expressly listed on the amendment's cover sheet, Amendment 0003 included a replacement page for page 40 of the RFP. This replacement page included a change regarding FAR § 52.216–18, the contract's Ordering Clause. The revised Ordering Clause read: "Contract award through September 30, 1994." Plaintiff argues that the statement "all terms and conditions remain unchanged," when considered in conjunction with the enumerated considered replacement pages on the amendment's cover sheet, permitted plaintiff to "fully rely" on the original ordering period. Plf's Br. filed Aug. 25, 1994, at 10. Therefore, plaintiff proceeds, the purported extension of the ordering period was nullified.

The Mint's failure to notify plaintiff that it was replacing page 40 of a 76–page document, while expressly notifying plaintiff that it was replacing pages 2, 11, 18, 34, and 76, is indeed irregular. The Comptroller General's sole comment on the issue is conclusory:

Notwithstanding Bliss's contention, the delivery order period has not expired. Rather, amendment No. 0003 extended the period for issuing delivery orders until September 30, 1994. In its arguments to the contrary, Bliss ignores the clear lan-

guage of amendment No. 0003, which it signed and returned to the agency on September 14, 1993.

*E.W. Bliss Co.*, 94–2 Comp.Gen. ¶ 280, at 3. Plaintiff contends that "[i]t was incumbent upon the agency to adequately warn offerors of any changes to the original solicitation, and not set a trap for the unwary...." Plf's Br. filed Aug. 25, 1994, at 10. Although a signatory to a contract is charged with constructive, if not actual, knowledge of the contract's provisions, the contracting officer undertook to alert prospective offerors of specific changes and made an omission in doing so. The purpose of this notification was to direct bidders to enumerated changes. The original contract document, plus the changed pages, constituted the contractual provisions with which the contractor was required to be familiar. To this point plaintiff's argument has merit. Amendment 0003 thus does not operate properly to extend the ordering period to September 30, 1994, and the Mint's issuance of delivery orders after that date violated the solicitation's Ordering Clause.

■ However, even though the Mint's failure expressly to notify plaintiff of the revised page 40 was improper, it is unclear how the Mint's inaction prejudiced plaintiff or in any way had an impact, let alone a "substantial impact," on the ultimate award. *Lincoln*, 230 Ct.Cl. at 428–29, 678 F.2d at 164. Plaintiff does not indicate, nor does the record reveal, how the Mint's allegedly improper method by which the ordering period was extended placed plaintiff at a competitive disadvantage. It is not enough for a protestor to establish that a statute or regulation has been violated. *Id.* The disappointed offeror must demonstrate that such a violation interfered with the contracting official's implied contractual obligation to fairly and honestly consider the claimant's bid. *Keco II*, 203 Ct.Cl. at 577, 492 F.2d at 1205. Plaintiff's argument fails as a result.

■ 2. Plaintiff argues that "[t]here was no base year award, therefore an option year award could not be made." Plf's Br. filed Aug. 25, 1994, at 10. The RFP provided for a base year through September 30, 1993; a first option year through September 30, 1994; and a second option year through September 30, 1995. In its award to Pressmasters, the Mint did not order any of the contract line items from the base year schedule, but did order six of the contract line items from the first option year schedule. Plaintiff asserts that the Mint's decision to order from the first option year schedule is improper because "the very concepts of 'base' and 'option' imply that there can be no exercise of an option unless the base product/service is purchased...." *Id.* at 11. Plaintiff appears to contend that it would have offered lower option year prices if it knew the agency could "by-pass[ ]" the base year schedule and order contract line items only from the first option year schedule. According to plaintiff, "[a]t the point where the agency decided not to award under the base year, the agency should have amended the solicitation and called for a new round of offers." *Id.* at 14.[3]

Plaintiff points to FAR §§ 15.410 and 15.606 (1992) in support of its argument that the Mint's selection of contract line items from the first option year was improper. FAR § 15.410 provides that after the issuance of an RFP, but before the proposal due date, an agency may, if necessary, make changes to the RFP, correct defects or ambiguities, or alter the closing date. FAR § 15.606 requires the agency to prepare a written amendment when the agency changes, relaxes, increases, or otherwise modifies its requirements. It is not clear how these regulations bear on the argument plaintiff attempts to make. In selecting contract line items from the first option year,

---

**3.** Plaintiff offers the following hypothetical:

Assume Seller signs a contract with Buyer; the contract provides that Buyer will purchase Seller's farm and that Buyer has an additional 30 day option to purchase Seller's cattle on the farm at a discount of twenty-five per cent off their then market value. Following execution of this agreement, Buyer gives notice that Buyer will not be purchasing Seller's farm, but

demands sale of the cattle at the discounted price. Does anyone seriously believe such a demand could be enforced in a court of law? Plf's Br. filed Aug. 25, 1994, at 12. Plaintiff's hypothetical does not bear factual similarity to the present case. The Mint selected the first option quantity because the specified base period had expired by the time the Mint awarded the contract.

the Mint did not make changes to, relax, increase, or otherwise modify its requirements under the RFP. Instead, the record reveals that the Mint awarded the contract line items from the first option year schedule because, as noted by the Comptroller General, "by the time of contract award—October 28, 1993—the solicitation's specified base period had expired." *E.W. Bliss*, 94–2 Comp. Gen. ¶ 280, at 4.

Under the indefinite quantity contract involved in this case, the Mint's only obligation is to order the stated minimum quantity. *See Mason v. United States*, 222 Ct.Cl. 436, 443 n. 5, 615 F.2d 1343, 1346 n. 5 ("If the contract contains such a minimum quantity clause, the buyer is required to purchase at least the minimum amount, but that is the extent of the legal obligation. . . ."), *cert. denied*, 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980). The Mint fully complied with this obligation.

Plaintiff's suggestion that it would have submitted lower first option year prices if it believed the Mint could bypass the base year ignores FAR § 52.215–16 (1992), which provides that "each initial offer should contain the offeror's best terms from a cost or price and technical standpoint." As explained in the Comptroller General's decision,

> [u]nder these circumstances, offerors are on notice to submit their best unit prices. If plaintiff failed to heed these warnings, it cannot now complain that it was prejudiced as a result. In this regard, plaintiff has not explained—nor does the record suggest—why its pricing would have been any different had the firm been aware that no base month period CLIN would be awarded.

*E.W. Bliss*, 94–2 Comp.Gen. ¶ 280, at 4–5 (citations omitted). Plaintiff fails to demonstrate how the Mint violated a relevant regulation or otherwise behaved irrationally in its procurement decision. *Keco* II, 203 Ct.Cl. at 574, 492 F.2d at 1203–1204.

3. Plaintiff makes dual contentions that the Mint's award to Pressmasters "did not conform to a material term of the solicitation, or the solicitation was ambiguous and thus defective." Plf's Br. filed Aug. 25, 1994, at 15–16. These related arguments concern the solicitation's purported requirement that each offeror provide a new crankshaft as part of the refurbishment project. This requirement appears in Amendment 0001 to the RFP, which the Mint issued in response to questions raised at a pre-proposal conference held on August 6, 1993:

> Q. How will we be able to determine if the crank shaft [sic] is good without disassembling the presses?
>
> A. The proposal should address a new crankshaft to insure consistencies between the new remanufactured presses. All old components removed from the presses shall be returned to the Mint for use as spare parts.

Plaintiff's technical proposal indicates that the drive units in each of the remanufactured coin presses will include a new crankshaft. Specifically, plaintiff's proposal states [redacted material]. Pressmasters' technical proposal, on the other hand, does not state or indicate that a new crankshaft would be installed in the remanufactured coin presses. Instead, Pressmasters proposed that it would "[e]valuate all parts for remanufacture or replacement." The only express reference to a crankshaft in the technical proposal appears under a subheading titled *"Options,"* where the proposal reads "Design & build new 4140 heat treated steel crankshaft for new air clutch & brake unit." Additionally, Pressmasters provided the following statement at the bottom of each price schedule: *"OPTIONAL:* NEW CRANKSHAFT & BRAKE CLUTCH . . . $17,400.00."

*1) Latent ambiguity in Amendment 0001*

 Taking plaintiff's second argument first, plaintiff posits that Amendment 0001 is ambiguous and cannot support an award. It is plaintiff's contention that this ambiguity provided Pressmasters a "cost advantage" in that Pressmasters was not required to factor into its base proposal the cost of four new, as opposed to four refurbished, crankshafts. Therefore, plaintiff argues that it was no longer competing on an equal footing. Although plaintiff did not raise this argument before the Comptroller General, in addressing the crankshaft issue, the Comptroller General stated:

**138**

As a preliminary matter, we note that our review of the record reveals that notwithstanding the agency's apparent intent to require a new crankshaft for each coin press retrofit, in fact the specification requiring this item is ambiguously worded. In this regard, where a solicitation requirement is susceptible to two or more reasonable interpretations in the context of reading the solicitation as a whole, we consider the requirement to be ambiguous.

*E.W. Bliss,* 94–2 Comp.Gen. ¶ 280, at 5 (citing *Pulse Elecs., Inc.,* B–243769, 91–2 Comp. Gen. ¶ 122 (1991)).

The Comptroller General is correct that the solicitation's requirement that proposals "address a new crankshaft" is susceptible to two or more reasonable interpretations. The record indicates that the Mint intended Amendment 0001 to require new, as opposed to refurbished, crankshafts in each of the remanufactured coin presses. The record further supports a finding that plaintiff interpreted Amendment 0001 consistent with the agency's intent. Pressmasters' proposal, however, can be interpreted in the same manner that plaintiff and the Comptroller General do, as reading Amendment 0001 to require a new crankshaft only in the event that existing crankshafts could not be refurbished. While this interpretation appears consistent with the solicitation's requirement that proposals "address" a new crankshaft, it is nevertheless at odds with the agency's own interpretation that the awardee provide new crankshafts as a mandatory requirement of the retrofit program.[4]

Under *Keco* II a competing contractor may be entitled to bid preparation costs if the agency's decision to award a contract had "no rational basis." 203 Ct.Cl. at 574, 492 F.2d at 1203–04. In this case the agency is responsible for a latent ambiguity in the solicitation. This defect might provide a basis for

entitlement to bid preparation costs only if the agency's consideration of Pressmasters' proposal was irrational due to the existence and significance of the ambiguity, or if the proposal was nonresponsive and therefore violated a regulation. This is the essence of plaintiff's next argument.

2) *Non-responsiveness of Pressmasters' bid*

■ Plaintiff argues that the latent ambiguity in Amendment 0001 allowed Pressmasters to circumvent the requirement that a new crankshaft be provided. Pressmasters' technical proposal does not expressly indicate that a new crankshaft will be supplied as part of its base proposal. Instead, Pressmasters' technical proposal merely states that Pressmasters will "[e]valuate all parts for remanufacture and replacement." Plaintiff takes the position that Pressmasters' technical proposal failed to conform to a material term of the solicitation and that the award to Pressmasters runs afoul of the procurement regulation mandating that proposals be responsive.

The Comptroller General treated this issue directly, focusing on the $17,400.00 optional new crankshaft and brake clutch referenced in Pressmasters' proposal. The Comptroller General reasoned:

Although the protestor interpreted this amendment consistent with the agency's intent—that offerors provide a new crankshaft as part of each coin press retrofit—it is clear from the record that the awardee interpreted this amendment to require a new crankshaft only in the event that the existing crankshaft could not be refurbished. Thus, in the section of its proposal addressing this requirement, Pressmasters indicated that it would "[e]valuate all parts for remanufacture or replacement." Given the imprecise wording of the question and answer set out above, we think that Press-

---

4. The doctrine of *contra proferentem* places the risk of latent ambiguity on the drafting party, provided the non-drafting party's interpretation is reasonable. *Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044, 1047 n. 4 (Fed.Cir.1994). The proponent of the ambiguity is a contractor that is disadvantaged by the ambiguous provision—typically by being required to perform additional or different work. Pressmasters made no complaint about the ambiguity.

The present scenario is atypical, in that the awardee's, and not the protestor's, differing interpretation formed the basis of the protestor's challenge. Both the Mint and plaintiff interpreted Amendment 0001 to require a new crankshaft, and plaintiff does not take the position that plaintiff itself relied on ambiguous language. The doctrine of *contra proferentem* therefore cannot be employed to resolve plaintiff's claim in its favor.

masters' proposal reasonably could be interpreted to comply with the direction in amendment No. 0001 to "address" a new crankshaft.

The protestor argues that as a result of the awardee's interpretation of the amendment, Pressmasters' offer was noncompliant with the requirement for a new crankshaft. The protestor asserts that Pressmasters' separately priced crankshaft/brake/clutch assembly was offered in lieu of a new crankshaft for the routine refurbishing effort, and consequently, Pressmasters' base offer does not include a new crankshaft. The agency responds that notwithstanding the awardee's interpretation of amendment No. 0001, offering a new OEM crankshaft was nevertheless implicit in Pressmasters' base proposal, in addition to its separate offer of a crankshaft/brake/clutch assembly. We agree. *E.W. Bliss,* 94–2 Comp.Gen. ¶ 280, at 6. The Comptroller General further stated that "Pressmasters properly acknowledged receipt of amendment 0001 ... thereby demonstrating its intent to perform in accord with the terms of the solicitation as amended...." *Id.* at 7. The Comptroller General observed that the crankshaft is an integral component of the coin press. Weighing these two factors together, the Comptroller General concluded that "although Pressmasters did not use the term "new crankshaft" in its offer, it nevertheless obligated itself to provide a new crankshaft whenever the circumstances of the retrofit operations so required...." *Id.* The Comptroller General also stated that "we think the agency reasonably concluded that Pressmasters' offer included a new crankshaft item for each coin press retrofit operation where appropriate...." *Id.*

The Comptroller General's conclusion that it was reasonable for the Mint to interpret Pressmasters' proposal to "address" a new crankshaft glosses over the fact that the Mint interpreted Amendment 0001 to require, not merely address, a new crankshaft. Despite this analytic shortcoming, the Comptroller General's ultimate determination is reasonable.

It is undisputed that the express terms of Pressmasters' technical proposal do not indicate an intention to provide a new crankshaft. Additionally, when considered in isolation, the phrase "[e]valuate all parts for remanufacture or replacement" cannot be read implicitly to indicate an intent to provide a new crankshaft.

Against this backdrop plaintiff argues that because Pressmasters' interpretation was based on an ambiguous contract provision and, although reasonable, differed from that of the Mint, Pressmasters' proposal was materially nonresponsive and the Mint therefore lacked a rational basis for making the award to Pressmasters. However, *Keco* II instructs that the proper focus of the inquiry is on the rationality, or reasonableness, of the agency's award decision. 203 Ct.Cl. at 574, 492 F.2d at 1203–04; *see Burroughs,* 223 Ct.Cl. at 67, 617 F.2d at 599 ("We decide only whether the contracting officer's actions were arbitrary and capricious.... The narrower question of whether the contract award was proper is not before us....") Accordingly, the Mint's understanding of Amendment 0001 plays a special role in the court's examination of the reasonableness of the Mint's interpretation of Pressmasters' technical proposal—that is, Pressmasters' technical proposal must be read in conjunction with the Mint's understanding of the solicitation's requirements.

The Mint read Amendment 0001 to require the eventual awardee to supply a new crankshaft. At the time of award, the Mint was unaware that Pressmasters' interpretation of the solicitation's requirements differed from that of the Mint. Since, under the Mint's interpretation, the solicitation required a new crankshaft, it was reasonable for the Mint to conclude that Pressmasters would provide a new, and not a refurbished crankshaft. The phrase "[e]valuate all parts for remanufacture or replacement" reasonably can be construed to indicate that after the existing presses have been disassembled and their component parts evaluated, those parts which the solicitation required to be remanufactured would be remanufactured, and those parts required to be replaced would be replaced.

The plain terms of Pressmasters' technical proposal do not call for a contrary reading.

Nothing in Pressmasters' proposal belies Pressmasters' intention to comply with the Mint's understanding of Amendment 0001.[5] While the Mint's reading of the technical proposal is strained, it is not unreasonable. Therefore, the Mint's decision to award the contract to Pressmasters, and the GAO's ultimate endorsement of that decision, were not "totally lacking in reason." *Keco* II, 203 Ct.Cl. at 579, 492 F.2d at 1206.

The determination that an award decision was reasonable does not end the inquiry. Plaintiff alleges that the award to Pressmasters violates procurement regulations. FAR § 14.301(a) (1992) provides that "[t]o be considered for award, a bid must comply in all material respects with the invitation for bids." The court has determined that Pressmasters' proposal, as construed by the Mint, was responsive.

Assuming, *arguendo*, that Pressmasters' proposal was materially nonresponsive and that the award violated FAR § 14.301, such a violation would not necessarily justify plaintiff's claim for bid preparation costs. *Keco* II, 203 Ct.Cl. at 578, 492 F.2d at 1206; *Burroughs*, 223 Ct.Cl. at 67, 617 F.2d at 599. "Not every regulation is established for the benefit of bidders as a class, and still fewer may create enforceable rights for the awardee's competitors." *Keco* II, *id.* The Court of Claims advised "that in those instances in which the alleged Government wrongdoing concerns only the prevailing bid and not the claimant's own rejected proposal, there should be careful examination of the claimant's particular rights and interests with respect to that specific type of misconduct." *Keco* II, *id.*; *Burroughs*, 223 Ct.Cl. at 68 n. 11, 617 F.2d at 599 n. 11.[6]

The specific "misconduct" at issue, under this assumption, would be the Mint's award of the contract to a non-conforming proposal in violation of FAR § 14.301. FAR § 14.301(a) provides that "compliance enables bidders to stand on an equal footing and maintain the integrity of the bidding process." FAR § 14.301 therefore appears to confer some rights on bidders as a class. Nonetheless, the scope of these rights, as the regulation itself indicates, must be measured in light of an overriding concern for the integrity of the procurement process.

Under the unique circumstances of this case, the procurement process would be disserved, if not disabled, were plaintiff's claim to bid preparation costs to prevail. As noted, the doctrine of *contra proferentem* places the burden of ambiguous contractual language on the drafter of the contract. In all, or almost all, government procurements, the agency authors the contract. Therefore, the agency is first called to task for misconduct regarding the competitor whose interpretation of the contract differs from that of the agency. Should the Mint have required Pressmasters

---

5. Pressmasters offered an optional new and upgraded crankshaft, separately priced, but neither the contracting officer nor the GAO construed this aspect of the proposal as the sole statement of compliance with the solicitation's requirement.

6. In *Burroughs* the Court of Claims rejected a disappointed offeror's claim that an award to a competitor's non-conforming proposal was arbitrary and capricious. 223 Ct.Cl. at 67–71, 617 F.2d at 599–601. *Burroughs* is factually similar to the present matter in that the successful proposal deviated from the RFP, although that case did not involve the added complexity of a latently ambiguous solicitation. The Court of Claims explained that, in determining whether an award decision was arbitrary and capricious, the proper focus was on the actions of the contracting officer. The court noted:

> The contracting officer's compliance, *vel non*, with the RFP and applicable regulations impinges upon this question in some degree, but it is merely one factor we consider in the broader context of his discretion, the reasonableness and motivation for his decisions and whether the regulations allegedly violated were designed for the benefit of the plaintiff-offeror. . . .

*Id.*

In evaluating these factors, the Court of Claims emphasized the "reasonableness and motivation" of the contracting officer. The court noted that "there is no suggestion whatsoever of subjective bad faith on the part of the contracting officer or any evidence contrary to the presumption that he, as a public official, acted conscientiously in the discharge of . . . [his] duty. . . ." *Id.*, 223 Ct.Cl. at 64–65, 617 F.2d at 597. Because the contracting officer's conduct itself could not be reproached, the alleged failure to abide by a particular procurement regulation did not control the question of whether the award decision was arbitrary and capricious. *Id.* Here, as in *Burroughs*, the procurement officials were not motivated by bad faith.

to supply new crankshafts and had Pressmasters sued for the additional costs on the basis that its interpretation was reasonable and that it bid in reliance thereon, application of the doctrine of *contra proferentem* would have required the Government to pay damages. If a disappointed offeror within the competitive zone, such as plaintiff, could thereafter seek bid preparation costs on the ground that but for the Mint's acceptance of a nonconforming bid, plaintiff would, and should, have been the awardee, the Government would be liable to serial lawsuits and multiple exposure for the same error.

The law creating a remedy for a latent ambiguity, as it has been applied, does not open the door for a disappointed offeror to step in after another contractor has sued successfully to recover costs incurred due to a latent ambiguity. Exposure to multiple penalties would place an untenable strain on the public fisc. In the particular circumstances of this case, were the court to have found that the Mint accepted a nonresponsive proposal, the offeror's interest in having a competitor's proposal evaluated properly would have to be subordinated to the public's interest in an efficiently and inexpensively administered procurement process. *Keco II,* 203 Ct.Cl. at 576–78, 492 F.2d at 1205–06; *Burroughs,* 223 Ct.Cl. at 66–68, 617 F.2d at 598–99.

4. Plaintiff argues that "[t]here was a failure to fairly evaluate 'Technical and Performance Features' of the technical proposals." Plf's Br. filed Aug. 25, 1994, at 19. The gravamen of this argument is that plaintiff's technical proposal was, at least in plaintiff's judgment, superior to Pressmasters' and that the TEP acted unreasonably in giving Pressmasters a higher score in the most important of the five technical criteria considered, *viz.,* "Technical and Performance Features." Plaintiff states that "the . . . (TEP) either ignored or was ignorant of [the] problem and, as to this evaluation factor, apparently rated awardee's proposal higher than plaintiff's. Whatever the panel had in mind, it did not award points for 'technical

and performance features. . . .'" *Id.* at 22. According to plaintiff "the agency had a hidden agenda which foreclosed any possibility of plaintiff scoring as high as awardee on this evaluation factor. . . ." *Id.*

■■ Even if plaintiff possessed a colorable claim to technical superiority, plaintiff's argument runs athwart the well-recognized principle that a court cannot substitute its judgment for that of procurement officials. *Keco II,* 203 Ct.Cl. at 579, 492 F.2d at 1207; *Continental Business Enters.,* 196 Ct.Cl. at 637, 452 F.2d at 1021; *M. Steinthal,* 455 F.2d at 1301. This principle applies with even greater force in cases such as this involving negotiated procurements. Procurement officials engaged in negotiated procurements enjoy a greater degree of discretion in determining which proposal is most beneficial to the Government. *Burroughs,* 223 Ct.Cl. at 65, 617 F.2d at 597. Here, the six members of the TEP, acting independently, determined that the technical and performance features of Pressmasters' proposal merited higher scores than those of plaintiff. Additionally, plaintiff overlooks the fact that the technical and performance features were but one of five technical criteria in the technical proposal, which itself was but one of several factors ultimately considered by the TEP in determining which proposal was most advantageous to the Government. The court declines to second-guess the TEP's decision. *Keco II,* 203 Ct.Cl. at 579, 492 F.2d at 1207.[7]

Plaintiff points to *DNL Properties, Inc.,* B–253614.2, 93–2 Comp.Gen. ¶ 301 (1993), for the proposition that evaluation documents must include contemporaneous narrative explanations depicting the strengths, weaknesses, and risks associated with each proposal. Plaintiff appears to suggest that the absence of contemporaneous narrative documents in this case bolsters its allegation that the Mint had a "hidden agenda" prejudicial to plaintiff. Plf's Br. filed Aug. 25, 1994, at 22. Plaintiff's argument is not supported by the record. The TEP's evaluation of the technical pro-

---

7. Individual members of the TEP set forth their scores on separate scoring sheets. The TEP assigned Pressmasters and plaintiff the following scores for technical and performance features:

| Evaluator | Plaintiff | Pressmasters |
|---|---|---|
| [redacted material] | | |

posals took place on September 1 and 2, 1993. On September 3, 1993, the contracting officer prepared a detailed narrative summary of the TEP's evaluation of each technical proposal.

5. In similar vein plaintiff argues that the Mint failed "to fairly evaluate 'Similar Design/Manufacture Experience' features of the technical proposals." Plf's Br. filed Aug. 25, 1994, at 23. Plaintiff's precise argument is again difficult to discern. Plaintiff observes that Pressmasters' proposal, unlike plaintiff's, contemplates the use of a subcontractor in satisfying the requirements of the contract. Plaintiff theorizes that the "subcontractor, since it has a contract with awardee and not the agency, will do the minimum amount necessary to abide by the terms of its subcontract agreement, (whatever that may be), not the agreement awardee made with the agency." *Id.* at 24. Therefore, according to plaintiff, Pressmasters' proposal "should not even have been placed in the competitive range." *Id.*

Plaintiff's argument is without merit. Plaintiff ignores the fact that it scored higher than Pressmasters in this evaluation category. Given the totality of circumstances, the award decision was reasonable.

6. Plaintiff argues that the Mint did not "fairly evaluate 'Quality Control System' features of the technical proposals." Plf's Br. filed Aug. 25, 1994, at 24. Plaintiff states that "plaintiff has a total quality control system in use at its facility. On the other hand, the record shows that in awardee's proposal there was [redacted material]. *Id.* at 25. Again, according to plaintiff, Pressmasters' proposal "should not have been placed in the competitive range." *Id.*

Plaintiff's argument is not based on a careful consideration of the record. On September 3, 1993, Barry Claybrook, a member of the TEP wrote a memorandum entitled Evaluation Summary of Bliss Press Remanufacture USM–93–14, which summarized the TEP's evaluation of Pressmasters' quality control program. The evaluation reflected that the contracting officer, in fact, did note that [redacted material]. However, the contracting officer also stated that Pressmasters' [redacted material]. Moreover, as in its

previous argument, plaintiff does not acknowledge that its evaluation scores were higher than those of Pressmasters in this category. The record indicates that the TEP evaluated the respective quality control programs of plaintiff and Pressmasters, determined that plaintiff's was superior, and scored it accordingly. Thus, there is no basis for plaintiff's argument that the Mint evaluated plaintiff's quality control program in an unreasonable manner.

7. Plaintiff argues that its "cost/price proposal was less costly than awardee's." Plf's Br. filed Aug. 25, 1994, at 26. Plaintiff asserts that "the agency's price computation was unfair; it did not consider the fact that the [redacted material] were optional items in awardee's proposal." *Id.* This argument is a reprise of plaintiff's earlier argument concerning the alleged cost advantage arising out of Pressmasters' interpretation of Amendment 0001.

8. Plaintiff argues that the Mint failed "to properly document and evaluate the cost/price proposals." Plf's Br. filed Aug. 25, 1994, at 27. Plaintiff asserts that "[b]est value awards cannot be made without a detailed rationale and supporting facts justifying the cost/technical trade-off, and if the agency makes an award at a higher price than the lowest responsible offeror it has the burden of proof in terms of justifying such a decision . . . ." *Id.* Plaintiff observes that, although Pressmasters received an overall technical score of 81, and plaintiff received a score of 78, both Pressmasters and plaintiff received adjectival ratings of " 'excellent.' " *Id.* at 28. On the basis of these identical adjectival ratings, plaintiff contends that "it cannot be said that awardee had a higher technical score than plaintiff." *Id.* Plaintiff asserts that the Mint failed to demonstrate why it was willing to "pay more for a technically inferior proposal." *Id.*

As noted, Pressmasters' technical proposal received a higher overall score than plaintiff's. No occasion was presented for a cost/technical trade-off to take place.

9. Plaintiff contends that the Mint failed "to properly document and evaluate the technical proposals." Plf's Br. filed Aug. 25,

1994, at 29. Plaintiff points to FAR § 15.612(d) (1992) for the proposition that the contracting officer must undertake and document an analysis of the competing proposals. FAR § 15.612(d) provides that "[t]he supporting documentation prepared for the selection decision shall show the relative differences among proposals and their strengths, weaknesses, and risks in terms of the evaluation factors . . . ."

Plaintiff's argument again ignores the record. In the Evaluation Summary regarding the submitted proposals, Mr. Claybrook listed various features that weighed in plaintiff's favor, including the fact that plaintiff is the original manufacturer of the presses. Mr. Claybrook also noted that plaintiff proposed a [redacted material]. Plaintiff also received high marks for its quality control system. However, Mr. Claybrook offered the following criticism of plaintiff's proposal:

> [T]hey did not go into the details of their new designs; therefore, an assessment could not be performed by the TEP. [Redacted material].

Mr. Claybrook's appraisal represents a balanced assessment of the respective merits and demerits of the proposals.

Mr. Claybrook treated Pressmasters' proposal in like fashion, noting among its negative features the [redacted material]. Mr. Claybrook also observed that Pressmasters' proposal did not [redacted material]. On the other hand, Mr. Claybrook noted several improvements over the specification requirements. These improvements included

[Redacted material].

Mr. Claybrook also took positive Pressmasters' [redacted material]. Mr. Claybrook concluded the summary evaluation by noting that Pressmasters and plaintiff had the highest overall technical scores.

■■■ Plaintiff asserts that the documents prepared for the selection decision do not contain discussion of whether Pressmasters' technical proposal included a new crankshaft. Plaintiff also asserts that the TEP report did not "discuss distinct CLINS within a schedule." Plf's Br. filed Aug. 25, 1994, at 31. The difficulty with this particular argument is that the applicable procurement regula-

tions do not require the summary documents to include an evaluation of the respective proposals item by item. The regulation cited by plaintiff, FAR § 15.608(a)(2) (1992), concerning documenting the technical evaluation, does not require this level of detail. Rather, this provision merely requires: 1) the basis for evaluation; 2) an analysis of the technically acceptable and unacceptable proposals; 3) a summary of each technical proposal in relation to the best rating possible; and 4) a summary of findings. FAR § 15.608(a)(2)(i)–(iv). Mr. Claybrook's summary evaluation fully complied with these requirements. Plaintiff's proposal itself precludes an item-by-item evaluation, because plaintiff's proposal omitted to discuss certain items of interest to the TEP. For example, Mr. Claybrook noted that plaintiff's technical proposal failed to [redacted material]. The Mint's failure to document its evaluation with the specificity urged by plaintiff cannot form the basis of an entitlement to bid preparation costs.

10. Plaintiff argues that the Mint failed "to follow solicitation evaluation guidelines." Plf's Br. filed Aug. 25, 1994, at 32. This argument borrows from plaintiff's arguments 3–9 above.

11. Plaintiff argues that the Mint failed "to insure impartial and comprehensive evaluation of [the] offerors' proposals and to reflect the source whose performance would best meet Government requirements," as required by FAR § 15.603. Plf's Br. filed Aug. 25, 1994, at 37. This argument is a restatement of portions of plaintiff's arguments 3–4 above.

12. Plaintiff argues that the Mint failed "to select a source whose proposal offered the greatest value to the Government in terms of performance and other factors." Plf's Br. filed Aug. 25, 1994, at 40. This argument is a summary of plaintiff's previous arguments.

13. Plaintiff's final argument appears to be a reprise of plaintiff's argument concerning the Mint's alleged failure to fairly evaluate "Similar Design/Manufacture Experience." Previously, plaintiff argued that awardee's proposal improperly contemplated the use of a subcontractor in satisfying the

requirements of the contract. Plaintiff repeats this point, but now attempts to bolster it by citing *Decision Systems Tech., Inc.*, B-257186, 94——— Comp.Gen. ¶ 108,600 (Sept. 7, 1994).

*Decision Systems*, however, stands for the opposite proposition. In that case, the Comptroller General held:

> Agencies may consider an offeror's subcontractor's experience under relevant evaluation factors where the RFP allows for the use of subcontractors to perform the contract and does not prohibit the consideration of subcontractor's experience in the evaluation process.

*Id.* at ¶ 117,490. Here, the solicitation incorporated FAR § 52.244–1 (1991), which specifically allows for the use of subcontractors in satisfying contract requirements. Additionally, there is nothing in the solicitation that prohibits the consideration of a subcontractor's experience in evaluating the technical proposals. *Decision Systems* is also inapposite in that the procurement in that case involved the agency's evaluation of a management proposal, a feature not present here.

### CONCLUSION

Accordingly, based on the foregoing, defendant's cross-motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied. The Clerk of the Court shall enter judgment dismissing the complaint.

**IT IS SO ORDERED.**